ALBERT N. HOXIE *vs.* ALDEN D. CHANEY & another.
ALDEN D. CHANEY & another *vs.* ALBERT N. HOXIE.

Suffolk. Nov. 17, 1886. — Feb. 24, 1887. HOLMES & GARDNER, JJ., absent.

The trade-marks "A. N. Hoxie's Mineral Soap," and "A. N. Hoxie's Pumice Soap," are assignable; and if the assignee uses them to denote soaps made according to the formulas of A. N. Hoxie, and not to denote that they are made by said Hoxie, he may maintain a bill in equity to restrain an infringement of the trade-marks.

A manufacturer, who had acquired trade-marks in two kinds of soap manufactured by him, entered into a partnership with another, under articles in writing by which he contributed the good-will of the business he was carrying on, with the tools, implements, and fixtures. On the dissolution of the partnership, he conveyed to his former partner, by a bill of sale, "the following goods and chattels, namely: All my right, title, and interest in and to all and singular the partnership property belonging to the firm, meaning hereby to sell and convey all my interest in the entire assets of the firm." *Held*, that the trade-marks became, by the articles of copartnership, a part of the property of the firm; and that they passed by the bill of sale. *Held, also*, on a bill in equity by the purchaser under the bill of sale to restrain the seller from making and selling said two kinds of soap, from using wrappers bearing the trade-marks, and from doing matters tending to injure and impair the good-will of the business, that the plaintiff was entitled to an injunction, except as to the making and selling the soap.

C. ALLEN, J. The first of these cases, in the order of time, is the bill in equity brought by Hoxie against Chaney and Pegram, praying that they may be restrained from the use of the name and words " A. N. Hoxie's Mineral Soap," and " A. N. Hoxie's Pumice Soap, manufactured by A. N. Hoxie, agent," which, as he alleges, constitute a trade-mark, and from the use of his name in their business. The decree was to the effect that the defendants have the sole and exclusive right to use the trade-marks " A. N. Hoxie's Mineral Soap," and " A. N. Hoxie's Pumice Soap," but have no right to use words importing that the soaps are made by Hoxie personally or as agent, and have no right to use the name of Hoxie in their business. From this decree Hoxie appealed to this court, but the defendants did not appeal, and therefore no question arises in this case except as to so much of the decree as was unfavorable to Hoxie, namely, that the defendants have the sole and exclusive right to use the trade-marks.

It is conceded by both sides that these words, taken together, constituted a trade-mark; but Hoxie contends that the use of his name, in the connection in which it occurs, makes them both trade-marks which are personal to himself, and which cannot be assigned. There may no doubt be cases where the personal skill of an artist or artisan may so far enter into the value of a product that a trade-mark bearing his name would, or at least might, imply that his personal work or supervision was employed in the manufacture; and, in such cases, it would be a fraud upon the public if the trade-mark should be used by other persons, and for this reason such a trade-mark would be held to be unassignable. It is in any case a question whether the use of the trade-mark would give to the public or to purchasers a false idea as to who made the article; and a court of equity would not lend any active aid to sustain a claim to a trade-mark which should contain a misrepresentation to the public. *Connell* v. *Reed*, 128 Mass. 477. *Manhattan Medicine Co.* v. *Wood*, 108 U. S. 218. But, on the other hand, the usages of trade may be such that no such inference would naturally be drawn from the use of a trade-mark which contains a person's name, and that all that purchasers would reasonably understand is that goods bearing the trade-mark are of a certain standard kind or quality, or are made

in a certain manner, or after a certain formula, by persons who are carrying on the same business that formerly was carried on by the person whose name is in the trade-mark. In the present case, the decree shows that the court found that the use of the trade-marks now in question does not import that the soaps were made by Hoxie personally, but merely that they were made according to his formulas; and this finding appears to be right. In *Kidd* v. *Johnson*, 100 U. S. 617, the trade-mark "S. N. Pike's Magnolia Whiskey " was held to be assignable. See also *Warren* v. *Warren Thread Co.* 134 Mass. 247; *Sohier* v. *Johnson*, 111 Mass. 238; *Leather Cloth Co.* v. *American Leather Cloth Co.* 11 H. L. Cas. 523; *Hall* v. *Barrows*, 4 DeG., J. & S. 150; *Bury* v. *Bedford*, 4 DeG., J. & S. 352, 369, 370.

These trade-marks became a part of the partnership property under the agreement entered into by Hoxie and Pegram, and passed to Pegram by the bill of sale executed by Hoxie to him. By the agreement, Hoxie in terms contributed the good-will of the business which he was carrying on, with the tools, implements, and fixtures. A continuation of his business was plainly contemplated; and, in point of fact, the trade-marks were used by the firm during the whole continuance of the partnership. The bill of sale is not controlled in its terms by any facts proved. There were negotiations looking to a retransfer to Hoxie of his interest in the partnership, at the close of the ensuing fishing season; but nothing was arrived at. Hoxie had violated the terms of the partnership agreement in several important particulars, which naturally led to Pegram's insisting on a dissolution. Under these circumstances, the bill of sale was signed, with no agreement, either written or oral, to take Hoxie back as a member of the firm. By it Hoxie sold to Pegram "the following goods and chattels, namely : All my right, title, and interest in and to all and singular the partnership property belonging to the firm of A. N. Hoxie & Co. (consisting of A. N. Hoxie and Frank R. Pegram), meaning hereby to sell and convey to said Pegram all my interest in the entire assets of said firm, wherever the same may be situated." These terms are broad, and, although the trade-marks and the good-will of the firm are not expressly mentioned, both are included within its meaning. *Sohier* v. *Johnson*, 111 Mass. 242, 243. 2 Lindl. Part. (4th ed.)

860, 861, 1046. *Shipwright* v. *Clements*, 19 W. R. 599. Pegram therefore became the owner of the trade-marks, and his firm of Chaney and Pegram are now entitled to their exclusive use.

The decree of the court in this case is, *Affirmed.*

The second of these cases is the bill in equity brought by Chaney and Pegram against Hoxie, and it proceeds on the ground that the exclusive right to use the trade-marks had become of great value ; that, by the agreement of partnership with Hoxie, and the bill of sale from Hoxie, Pegram had become the owner of them, with the good-will of the business ; that Hoxie has now opened a soap factory and is manufacturing the two kinds of soap, and is putting them up in wrappers bearing the trade-marks, and has issued circulars and cards using and availing himself of the trade-marks. The prayer is for an injunction to restrain Hoxie from making and selling said two kinds of soap, from using the wrappers bearing the trade-marks, and from doing other acts tending to injure and impair the good-will of the business. The decree, after affirming Chaney and Pegram's ownership of the trade-marks, was, in substance, that Hoxie ought not to interfere with or compete with them in the business of making or selling mineral or pumice soap in Boston, and ought to be enjoined from using the trade-marks, or any imitations thereof, and also from competing with and from endeavoring to disturb or interrupt the business of said Chaney and Pegram in the manufacture and sale of said soaps ; and that injunctions should issue accordingly.

So far as the ownership and use of the trade-marks are concerned, the decree should be affirmed. But in reference to what is involved in the transfer of the good-will of the business it requires some modification. Neither the agreement of partnership between Hoxie and Pegram, nor the bill of sale from Hoxie to Pegram, contained any agreement that Hoxie, upon a dissolution of the firm, should not carry on a similar business, further than is implied by the transfer of the good-will, pure and simple. The general rule in this Commonwealth, as applicable to the sale of a stock in trade in a particular store, and of the good-will of the vendor's trade and all the advantages connected with such place of business, is that such a sale does not import

an agreement by the vendor not to engage again in a similar business in some other place at a subsequent time. *Bassett* v. *Percival*, 5 Allen, 345, 347. The court say, " Whenever such is the intent of the parties, it is carried into effect by an express stipulation, which, if not in undue restraint of trade, may be valid and binding. But we know no case where any such agreement has been raised by mere implication, arising from the sale of the good-will of a person's trade, in connection with a particular place of business where it has been carried on." There may be cases and circumstances where it will be difficult to tell just how much is included in a sale merely of the good-will of a business. Such difficulties might exist where the business is not local in its character, but extends over a considerable region or line of travel; as, for example, in the case of a carrier, an express company, a canvassing agency, or a newspaper. But it is not necessary at this time to enter upon the consideration of such cases. In the present case, there is nothing in the averments or proof to show that the business of Chaney and Pegram was carried on by means of travelling agencies, or that Hoxie has directly or personally solicited customers of Chaney and Pegram to leave them and to buy of him; and the case falls within the doctrine of *Bassett* v. *Percival*, above cited.

It is proper to refer to the distinction which exists between *Bassett* v. *Percival* and several later cases. In *Angier* v. *Webber*, 14 Allen, 211, arising about four years later, in which the opinion of the court was delivered by Chief Justice Bigelow, who also delivered the opinion in *Bassett* v. *Percival*, the sale was of the good-will of a teaming business in Boston and between Boston and Somerville, with a special agreement not in any manner to do anything which should in any wise impair or injure the good-will. This was a business which was done on the road, and all along the line between two cities. In *Dwight* v. *Hamilton*, 113 Mass. 175, the defendant's " practice and good-will as a physician" was sold, with the land and buildings where he lived, and, from the nature of the good-will and practice of a physician, the case was said to be clearly distinguishable from *Bassett* v. *Percival*, and to resemble *Angier* v. *Webber*. In *Munsey* v. *Butterfield*, 133 Mass. 492, the plaintiff agreed to sell certain articles of personal property used in the milk business,

" also the good-will of said Munsey's milk route lying in West Somerville, East Somerville, North Somerville, and Charlestown ; " and, before completing the transaction, the plaintiff bargained with another person to buy a milk route which ran over a portion of the same territory in Charlestown and Somerville as the route which he had sold to the defendant; and, the defendant having refused to complete the purchase, this was held to fall within the same rule as *Angier* v. *Webber* and *Dwight* v. *Hamilton.* All of these later cases rest upon the peculiar character of the good-will which was the subject of sale, and neither of them, in the matter decided, disturbs the decision in *Bassett* v. *Percival,* which also is in accord with most of the recent decisions elsewhere, so far as they have come under our observation. See *Pearson.* v. *Pearson,* 27 Ch. D. 145, where the late English decisions are reviewed; *Cottrell* v. *Babcock Printing Press Manuf. Co.* 54 Conn. 122; 2 Lindl. Part. 859 *& seq.*

In the circular headed " Special Notice to the Wholesale and Retail Trade," Hoxie virtually represented himself as the successor to the business, the good-will of which he had sold, and also asserted a right to the trade-mark. This was in excess of what he could lawfully do. *Churton* v. *Douglas,* H. R. V. Johns. 174.

Inasmuch as there is nothing in the averments or proof which shows any undue or unlawful interference or competition, on the part of Hoxie, except in respect to the use of the trade-mark on wrappers and in circulars and otherwise, and the virtual representation of himself as the successor to the business of the old firm, the decree in the second case should be modified, by inserting a specification that he is not to interfere or compete with the business of Chaney and Pegram, " by representing himself, either directly or by implication, as the successor of the late firm, or as doing the same business that was done by them ; " and the decree is affirmed in respect to the use of the trade-marks, and in other respects. *Decree accordingly.*

*D. C. Linscott,* for Hoxie.

*W. B. French,* for Chaney and Pegram.