John D. Cutter, Appellant, v. Gudebrod Brothers Company Respondent.

*Trade name — sale by an assignee of an insolvent corporation of a portion of its stock in trade, including the trade name of an individual marked on its goods — right of the individual to use his own name — his right to prevent the purchaser from using it.*

One John D. Cutter, who had built up a reputation for himself as a manufacturer of spool silks, organized a corporation known as the Cutter Silk Manufacturing Company, "to inform the public (under the requirements of the Pennsylvania statute) that the silk manufactured by said company or corporation" was "of a certain kind and quality known as Cutter's silk, or silk goods produced by John D. Cutter," of which corporation he became president and was the principal stockholder, while John D. Cutter & Co., who had offices in the city of New York, were constituted the selling and buying agents of the corporation, which continued the manufacture of spool and other silks, using the names John D. Cutter, John D. Cutter & Co., or J. D. C. & Co., upon the ends of the spools. In a transfer of property made from John D. Cutter & Co. to the Cutter Silk Manufacturing Company were included certain cabinets, which had been distributed among the retail dealers of the country, and were used to contain the spool silks, being marked with the firm name John D. Cutter & Co., John D. Cutter, or J. D. C. & Co., or by that of Cutter, or the initials.

Subsequently the corporation, becoming embarrassed, made an assignment for the benefit of creditors, and the assignee sold a portion of the manufactured spool silks, "together with the right, title and interest of the Cutter Silk Manufacturing Company and of the party of the first part as its assignee for the benefit of creditors, in the trade names or trade marks of 'J. D. Cutter & Co. and 'J. D. Cutter' and 'J. D. C. & Co.,' heretofore used in the manufacture and sale of sewing silks, flosses, twist and art silks."

*Held,* that such purchaser did not acquire a right to prevent John D. Cutter from making use of his own name in continuing his business as a manufacturer or dealer in spool silks.

*Semble,* that if John D. Cutter had a right to the use of his own name in the manufacture and vending of spool silks, and the use of his name in its various combinations by the purchaser was calculated to deceive the public into the belief that it was getting the goods manufactured under the direction of John D. Cutter, there appeared no good reason why John D. Cutter should not have relief restraining the purchaser from using his name on the same line of goods, where its use was likely to produce confusion, but not from selling with the name of John D. Cutter thereon the spools and stock of the corporation; which it had acquired by its purchase.

Appeal by the plaintiff, John D. Cutter, from a judgment of the Supreme Court in favor of the defendant, entered in the office

of the clerk of the county of Kings on the 18th day of August, 1898, upon the decision of the court rendered after a trial at the Kings County Special Term restraining the plaintiff from using certain trade names.

*Robert B. Honeyman,* for the appellant.

*G. H. Crawford,* for the respondent.

WOODWARD, J.:

It is clear, upon every equitable consideration, that the judgment restraining the plaintiff from the use of his own name, or the initials of his own name, in the transaction of the business incident to the manufacture and sale of spool silks, cannot be sustained. It can never be the policy of the law to deprive the citizen of the power to make use of his good name and reputation in the conduct of any legitimate business, and courts of equity will not presume anything in favor of the person demanding such relief. The plaintiff in this action has spent the best years of his life in building up a reputation for himself as a manufacturer of spool silks. He originally had factories at Newark and Paterson in the State of New Jersey. He afterward constructed a manufacturing plant at Bethlehem, Penn., and organized a corporation for the purpose of carrying on the business. This corporation was known as the Lehigh Silk Company, but was subsequently reorganized as the Cutter Silk Manufacturing Company, the object of the change, conforming to the requirements of the Pennsylvania statute, being " to inform the public that the silk manufactured by said company or corporation " was " of a certain kind and quality known as Cutter's silk, or silk goods produced by John D. Cutter." John D. Cutter, the plaintiff in this action, was the president of the corporation and was the principal stockholder, while John D. Cutter & Co., who had offices in the city of New York, were constituted the selling and buying agents of the corporation. This corporation, with John D. Cutter at its head, continued the manufacture of spool and other silks, using the names John D. Cutter, John D. Cutter & Co., J. D. C. & Co., upon the ends of the spools, thus carrying out the purpose of the corporation, as stated above, to inform the public that these silk goods were produced by John D. Cutter. In the transfer of property from John

D. Cutter & Co. to the Cutter Silk Manufacturing Company an inventory of the merchandise and property assets was made by a committee of the corporation, and included in this list of property were certain cabinets which had been distributed among the retail dealers of the country, and which were used to contain the spool silks manufactured by John D. Cutter & Co. These cabinets were marked with the firm name, or by that of Cutter, or the initials; and these cabinets were given a certain valuation in the inventory, and it is upon this basis that it is claimed that the company in some manner came into possession of the exclusive right to use the names.

In 1896 the corporation became embarrassed, and a general assignment was made to John Field for the benefit of creditors. The corporation assigned " all its estate and property of whatsoever kind, goods, chattels and effects, except, however, as much thereof as may be exempt from execution." Subsequently the defendant in this action purchased of the assignee a portion of the manufactured spool silks, " together with the right, title and interest of the Cutter Silk Manufacturing Company and of the party of the first part as its assignee for the benefit of creditors, in the trade names or trade marks of ' J. D. Cutter & Co.' and ' J. D. Cutter ' and ' J. D. C. & Co.' heretofore used in the manufacture and sale of sewing silks, flosses, twist and art silks." Is there any ground for assuming that John D. Cutter & Co., in making the transfer to the Cutter Silk Manufacturing Company, conveyed any exclusive right to the use of those names? The company still owned the machinery in the Paterson factory, and had other property, and, in the absence of any special mention of the trade names or trade marks, we are unable to see how there could have been such a transfer as to entitle the corporation to the use of these names to the exclusion of the plaintiff, although there can be no doubt of the right of the corporation, with the consent of Mr. Cutter, its president, to use them, as it conveyed no false impression to the public; the goods were, in fact, produced under the direction of John D. Cutter. If, then, there was a doubt as to the corporation owning these names, could the assignee, under a general assignment which excepted in terms " as much thereof as may be exempt from execution," get a title by which he could transfer to the defendant the rights which it asserts in its affirmative defense? We think not. " While it is

true," say the court in the case of *Bellows* v. *Bellows* (24 Misc. Rep. 482), " that a person may, by proper assignment, convey the right to use his name in any business, yet such assignment must be an unequivocal and direct conveyance of such right ; and such right would not pass, under the ordinary phraseology of a general assignment for the benefit of creditors." In the case of *Helmbold* v. *Helmbold Manufacturing Co.* (53 How. Pr. 453) it was established that Henry T. Helmbold was the original manufacturer of an article known as " H. T. Helmbold's Highly Concentrated Compound Fluid Extract of Buchu," and that he continued for several years to manufacture the article. In 1872 he was declared and adjudged a bankrupt, and an assignee in bankruptcy was appointed for his estate. Under the order of the bankrupt court the plaintiff claimed that the title to, and the right to use, the name " H. T. Helmbold's Highly Concentrated Compound Fluid Extract of Buchu," in the manufacture and sale of the compound which had been acquired by said Henry T. Helmbold through use, became vested in such assignee, who, in turn, transferred it to the plaintiff. In discussing the facts thus presented, denying the injunction prayed for, the court say : " It is not denied that Henry T. Helmbold could, by voluntary sale and assignment, transfer the right to use his knowledge and name, but it is not seen how the right to use his own knowledge and name can be taken from him by any judicial proceeding whatever. If they can be, then the merchant who has become unfortunate, but who has still a knowledge and a name with which to begin business anew, must, if he has been adjudged a bankrupt, be content to leave with his assets his brains and his character. * * * Admitting that the plaintiff has the secret of the compound, which was once Henry T. Helmbold's alone, * * * did the decree of the bankrupt court transfer the sole right to use it to the assignees in bankruptcy and thence to the plaintiff ? This will not be claimed ; neither is it pretended that the mixture is not, in fact, what its name declares, 'A Fluid Extract of Buchu,' the right to make which and to declare by plain words in common and general use the character of the mixture, must, in the absence of a patent protecting the process of manufacture, belong to any one able to make the article, and who desires to utilize his knowledge by its preparation and sale. * * * The name of a man is a part of his being, so indissolubly connected with and attached

to him, that we fail to see how the one which distinguishes and separates Henry T. Helmbold from all mankind, and enables the public to know him and that which he has prepared, can be taken from him and given to another, so that the latter, by the use of such name, may vend and sell his own preparations as if they were those of the former. If this can be done, then the law and the courts not only enable the quack and the adventurer to impose their compounds and manufactures upon the public under the disguise and cover of an honored name, but they have, with the property of the unfortunate bankrupt, also appropriated and transferred his knowledge, skill and reputation. * * * He has the right to make any extract he pleases, and to tell the public by the use of his own name that the preparation is his and not that of another, and neither the plaintiff nor any other person can place that name upon a preparation not his, against his will, and deprive him of the use thereof. Such act would not only impose upon others, but would also be so cruel and outrageous toward him that, as it seems to me, no law and no court could justify it."

The reasoning in this case applies equally to the one at bar. It cannot be contended that the plaintiff transferred to the company his formula or his method of making spool silks to the exclusion of that right in himself; and there can, therefore, be no question of his right to use his own name in describing the product of his own skill and genius in the manufacture of spool silks, for it cannot be contended that there is any justification for holding that the word "silk" can be appropriated by one manufacturer to the exclusion of others. On the other hand, to permit the injunction against the plaintiff to stand is to permit the defendant to place upon the market, as the product of the plaintiff, goods which he has had no part in producing, and for the quality of which he is in nowise responsible. This is a fraud upon the public, and the case is not altered by the alleged fact that the goods are better than those which the plaintiff has formerly offered; they are placed before the public as the product of the plaintiff, when, in fact, they are manufactured by the defendant. "The defendant's name being Holloway," say the court in the case of *Holloway* v. *Holloway* (13 Beav. 209), "has a right to constitute himself a vendor of Holloway's pills and ointment, and I do not intend to say anything tending to abridge

any such right. But he has no right to do so with such additions to his own name as to deceive the public and make them believe that he is selling the plaintiff's pills and ointment." So in the case of *Croft* v. *Day* (7 Beav. 84) the master of the rolls says : " He has a right to carry on the business of a blacking manufacturer honestly and fairly ; he has a right to the use of his own name. I will not do anything to debar him from the use of that, or any other name calculated to benefit himself in an honest way, but I must prevent him from using it in such a way as to deceive and defraud the public." If the court will use its power to prevent a man using his own name in such a manner as to defraud the public by causing goods of his own manufacture to be put upon the market as the product of another, there certainly can be no good reason, under the circumstances of this case, to restrain the plaintiff in this action from putting goods of his own manufacture into the markets as his own product and under his own name. This is contrary to all precedent and reason.

" The injunction awarded by the decision of the referee," say the court in the case of *Meneely* v. *Meneely* (62 N. Y. 427, 430), " restrained the defendants from in any way using the name and designation ' Meneely ' in the business of bell founding in the city of Troy. The name of one of the defendants is Meneely, and he was engaged in the business mentioned. The necessary consequence of the injunction was to compel the defendant Meneely either to discontinue his business of bell founding at Troy or procure it to be conducted in the name of some other person. He was absolutely prohibited from the use of his own name in his own business in any way. The bare statement of the scope of the injunction would seem to be sufficient to show that it ought not to have been granted, and that the judgment awarding it was erroneous. * * * If the defendants were using the name of Meneely with the intention of holding themselves out as the successors of Andrew Meneely and as the proprietors and managers of the old-established foundry which was being conducted by the plaintiffs, and thus enticing away the plaintiffs' customers, and if, with that intention, they used the name in such a way as to make it appear to be that of the plaintiffs' firm, or resorted to any artifice to induce the belief that the establishment of the defendants was the same as that of the plaintiffs,

and, perhaps, if without any fraudulent intent they had done acts calculated to mislead the public as to the identity of the establishments, and produce injury to the plaintiffs beyond that which resulted from the similarity of name, then the cases referred to sustain the proposition, not that a court of equity would absolutely restrain the defendant Meneely from the use of his own name in any way or form, but simply that the court would enjoin him from using it in such a way as to deceive the public and injure the plaintiffs. The manner of using the name is all that would be enjoined, not the simple use of it; for every man has the absolute right to use his own name in his own business, even though he may thereby interfere with or injure the business of another person bearing the same name, provided he does not resort to any artifice or contrivance for the purpose of producing the impression that the establishments are identical, or do anything calculated to mislead." (See *Howe* v. *Howe Machine Co.*, 50 Barb. 236.)

"It would be a far-reaching extension of the powers of a court of equity," say the court, in *Meneely* v. *Meneely* (1 Hun, 367, 375), "to grant an injunction which would protect the plaintiffs in the use of all the different names by which they have been in the habit of being addressed by their customers. There is no adjudged case which has protected trade marks to such an extent, or ever struck out the name of a single member of a firm, because it was similar to another engaged in the same business."

In the case of *Samuel* v. *Berger* (24 Barb. 163) the court say: "The rule governing the interference of courts in this and like cases is well laid down by DUER, Justice, in *Amoskeag Manufacturing Company* v. *Spear* (2 Sand. 607). He says: 'At present it is sufficient to say that in all cases where a trade mark is imitated, the essence of the wrong consists in the sale of the goods of the manufacturer or vendor as those of another, and it is only when this false representation is directly or indirectly made, and only to the extent in which it is made, that the party who appeals to the justice of the court can have a title to relief.' Applying these principles to the facts in this case, we shall see, I think, that the plaintiffs invoke a rule of law which the defendants might claim to be applied to them, but which will not avail the plaintiffs. The plaintiffs say that Brindle, as a watchmaker, had acquired a reputation as

such, and that all watches manufactured by him were stamped with his name. That Sylvester J. Samuel purchased from Brindle the right to stamp Brindle's name on watches manufactured by Samuel, and that Samuel assigned to the plaintiffs the right to stamp Brindle's name on watches manufactured by them. The defendants have on hand for sale the watches manufactured by Brindle and stamped with his name, and this court is called upon to restrain them by injunction from selling the genuine article, and thus to protect the plaintiffs in selling the simulated. The plaintiffs ask this court to aid them in passing off on the public watches manufactured by them, and held out to the public as made by Brindle, when in truth the watches made by Brindle and stamped by him with his name are those which the defendants seek to sell. If the defendants were seeking to make sale of watches manufactured by them, as those manufactured by Brindle, and the right of the plaintiffs to use his name as a trade mark was clear, then the injunction should go, but I think they cannot call on this court to aid them in passing off the watches made by them as those manufactured by Brindle," nor do we think that this court can sustain an injunction which undertakes to aid the defendant in this action in palming off upon the public, as the manufactures of John D. Cutter, the goods produced at the factory of the defendant, and with which the plaintiff has no relations whatever. (See *Faber* v. *Faber*, 49 Barb. 357.)

It seems clear, under the authorities in this State, that the defendant is not entitled to the affirmative relief demanded; it has no right to deny to the plaintiff the right to the use of his own name in continuing his business as a manufacturer or dealer in spool silks, thus making valueless the years of experience and the good name which he has established as a manufacturer of this class of goods. We have likewise reached the conclusion that the defendant, having acquired no just title to the use of the name of the plaintiff, should not be permitted to continue the use of that name in its various combinations to the damage of the plaintiff, because so to do is to deceive and defraud the public, by leading them to believe that they are getting the goods manufactured by or under the supervision of John D. Cutter. " A man," says the assistant vice-chancellor in the case of *Coats* v. *Holbrook* (2 Sandf. Ch. 645, 653), " is not to sell

the goods or manufactures of B., under the show or pretense that they are the goods or manufactures of A., who, by superior skill or industry, has established the reputation of his articles in the market. The law will permit no person to practice a deception of that kind, or to use the means which contribute to effect it. He has no right, and he will not be allowed, to use the names, letters, marks or other symbols by which he may palm off upon buyers as the manufactures of another the article he is selling, and thereby attract to himself the patronage that, without such deceptive use of such names, etc., would have enured to the benefit of that other person who first got up, or was alone accustomed to use such names, marks, letters or symbols."

In *Clark* v. *Clark* (25 Barb. 76) the court say: "The law of trade marks is of recent origin, and may be comprehended in the proposition that a dealer 'has a property in his trade mark.' The ownership is allowed to him that he may have the exclusive benefit of the reputation which his skill has given to articles made by him, and that no other person may be able to sell to the public, as his, that which is not his." (See *Stokes* v. *Landgraff*, 17 Barb. 608.)

In the case of *Koehler* v. *Sanders* (122 N. Y. 65, 74) the court, after discussing the rule in reference to the exclusive use of words which are truly descriptive of the article, such as the words "silk," "brandy," etc., and of names embracing geographical locations, say: "The application of this principle is not necessarily dependent upon a proprietary right in a name or the exclusive right to its use. But when another resorts to the use of it fraudulently as an artifice or contrivance to represent his goods or his business as that of the person so previously using it, and to induce the public to so believe, the court may, as against him, afford relief to the party injured."

"The protection afforded to trade marks rests upon the principle of preventing a fraudulent appropriation of a name by which only the product or manufacture of another is designated, and of shielding the public against deception by such means." (*Wolfe* v. *Burke*, 7 Lans. 151, 155.)

"If one affix to goods of his own manufacture signs or marks which indicate that they are the manufacture of others," say the court in the case of *Manhattan Medicine Co.* v. *Wood* (108 U. S. 218, 223), "he is deceiving the public and attempting to pass upon them goods as possessing a quality and merit which another's skill has

given to similar articles, and which his own manufacture does not possess in the estimation of purchasers. To put forth a statement, therefore, in the form of a circular or label attached to an article, that it is manufactured in a particular place, by a person whose manufacture there had acquired a great reputation, when, in fact, it is manufactured by a different person at a different place, is a fraud upon the public which no court of equity will countenance."

This was a case where the complainants came into the possession of the trade mark by assignments from the original user, and the court refused an injunction upon the ground that the complainants were making false statements; and this is practically the position of the defendant in the case at bar. By the use of the name Cutter it is seeking to convey to the public the idea that the spool silks which they are putting upon the market are those manufactured by J. D. Cutter, which have gained an enviable reputation by reason of their uniformity and excellence.

In *Matter of Adams* (24 Misc. Rep. 293), Robert Adams, who had been doing business as R. & H. Adams, was forced to make an assignment, and an *ex parte* order was granted directing the assignee to sell the trade name. On a motion to set aside this order, which was granted, the court say : " The supposed trade mark is substantially the name of the assignor, Robert Adams, who did business under the name of R. & H. Adams. If his name is of value as a trade mark, it was made so by the skill and energy with which he associated that name in his conduct of the business prior to the assignment. If it shall now forever be transferred to a stranger t( be used, by an involuntary transfer so far as Robert Adams is concerned, and alone by force of an assignment of the name by the general assignee whose duty ends with the conversion of the property of the assignor into money for the payment of debts, then we have the case of a stranger using a name not associated with his own business solely by force of the assignment, while the assignor himself is debarred forever from using his own name in his future efforts to retrieve his fortunes by intelligence and energy in any way that would lead the public to believe that the same person was manufacturing and vending goods, who formerly manufactured the same line under the name ' R. & H. Adams.' No authority has yet been cited by counsel to justify such a result."

In the case of *Russia Cement Co.* v. *Le Page* (147 Mass. 206) the defendant and one Brooks had been engaged as copartners in the manufacture of cement. They also produced certain lighter glues, and, the name of Le Page appearing to Brooks to have a distinctiveness about it which was likely to attract attention, it was agreed that the light glues should be known as Le Page's Liquid Glue. Subsequently Le Page and Brooks sold to the plaintiff corporation, transferring the property " together with all the cash and book accounts belonging to the said firm, the good will of the business, and the right to use the trade marks belonging to or in use by the said copartnership." The plaintiff engaged in the business and expended large sums in advertising Le Page's glues. Le Page was a director in the plaintiff corporation for several years after the sale, but finally withdrew and began the manufacture of cement, using the name " Le Page's Liquid Glue and Cement Co., Gloucester, Mass.," and advertising his goods as " Le Page's Improved Liquid Glue." The court to which the application for an injunction was made refused the application, but on appeal the prayer was granted to the extent that the defendant was restrained from using the words, " Le Page's Improved Liquid Glue " or " Le Page's Liquid Glue," and from using the name of " Le Page's Liquid Glue Co." The court adds, however, that " while the plaintiff has not sought to prevent the defendant from manufacturing glue, we add, in order to avoid misunderstanding, that while the defendant cannot use the words adopted as a trade name for the article manufactured by him, we do not decide that he may not use the words ' Liquid Glue,' or other appropriate words to describe his product, or to state in that connection that he is himself the manufacturer of it." In this case there was not only a sale of the trade name, but it was before the court that Le Page was not a necessary factor in the manufacture of this glue, his name being used purely because of the novelty of its construction, and yet he was not denied the right to use his own name in connection with the same line of business, but simply not to use it in such a manner as to interfere with the rights of the plaintiff in the particular combination. The same doctrine was asserted in the case of *Hoxie* v. *Chaney* (143 Mass. 592), and we have been unable to find any case in which an injunction has been broad enough in its terms to prevent a person from using his own

name in the transaction of a legitimate business. The case of *Higgins Co.* v. *Higgins Soap Co.* (144 N. Y. 462) was dealing with a corporation, in which the court clearly pointed out that the individual was merged in the artificial person created by statute, and that his personal name was not involved in the controversy.

If, then, the plaintiff has a right to the use of his own name in the manufacture and vending of spool silks, and the use of the name in its various combinations by the defendant is calculated to deceive the public into the belief that they are getting the goods manufactured under the direction of the plaintiff, there is no good reason why the plaintiff should not have the relief prayed for. Two manufacturers using the same trade names on the same line of goods are likely to produce confusion, and "it is a reasonable presumption," say the court in the case of *Higgins Co.* v. *Higgins Soap Co.* (*supra*), "that if the defendant is permitted to continue to carry on the business of soap making under its present name the public will be misled and the plaintiff's trade diverted, the extent of such diversion increasing with the increase of the defendant's business."

The injunction against the plaintiff should have been denied, and the prayer of the plaintiff to dissolve the injunction should have been granted. Of course, the injunction order should not restrain the defendant from selling, with the name of Cutter upon the spools, the stock of the late corporation which it acquired by purchase; not only did it buy the silk thread with this name upon it, but the statement on the spool that the silk thread was manufactured by Cutter is true.

The judgment should be reversed and a new trial granted, costs to abide the event.

All concurred.

Judgment reversed and new trial granted, costs to abide the final award of costs.