E. J. FAUST v. A. J. ROHR.

(Filed 30 May, 1914.)

**Contracts—Restraint of Trade—Partnerships—Waiver.**

F. and R., barbers, were partners in the town of M. F. bought out R. under an express agreement that the latter would not engage in the same business in the town of M. so long as F. continued it there. They again formed a partnership at M., and thereafter R. separately engaged in the trade of barber in opposition to F. *Held,* that the negative stipulation in the agreement of the parties in the former dissolution was intended to prevent rivalry between them in opposing the skill and influence of R. in the business of barber at M., which was not revoked impliedly by the formation of their second partnership, for therein both

the skill and influence of R. was for the firm's benefit, and to the advantage of each member, and the formation of the second partnership could not in any manner conflict with the agreement entered into between F. and R. upon the dissolution of the first partnership, nor be considered as a waiver of the rights of F. to insist upon it; and it is further held that the agreement was not objectionable as being in restraint of trade, and is, therefore, enforcible. The law as to contracts in restraint of trade discussed by WALKER, J.

APPEAL by plaintiff from *Shaw, J.,* at May Term, 1914, of UNION.

This is a motion to vacate a restraining order, previously granted in the action, by which the defendant was "restrained and enjoined from engaging directly or indirectly, or concerning himself, in carrying on or conducting the business of a barber, either as principal, agent, or servant, within the corporate limits of the city of Monroe, N. C., until the further order of the court." The defendant was further required to show cause on Monday, 4 May, 1914, why the restraining order should not be continued, or an injunction granted, to the hearing. On the return day of the order the matter was heard and decided by the court upon the following case stated by the judge from the affidavits filed:

"This cause coming on to be heard upon the return of the temporary restraining order hereinbefore issued by the undersigned, and being heard on affidavits of plaintiff and defendant and of other witnesses filed in support of and against a motion by defendant to dissolve the temporary restraining order, on consideration of same the court finds the following facts:

"1. That prior to 15 December, 1902, plaintiff and defendant were partners engaged in the business of conducting a barber shop in Monroe, N. C. That on said date plaintiff and defendant entered into the contract evidenced by plaintiff's Exhibit A. That on 29 December, 1902, plaintiff and defendant entered into the contract evidenced by defendant's Exhibit 2, and under said contract the defendant worked for plaintiff for about a year at a wage of $2 per working day. That ever since the first contract was executed the plaintiff has been and is still engaged

FAUST *v.* ROHR.

in the business of running a barber shop in said city of Monroe.

"2. That plaintiff and defendant entered into other contracts of employment of defendant by plaintiff to work in his shop as a barber, defendant's wages being increased by plaintiff from time to time until the month of June, 1913.

"3. That on 12 June, 1913, plaintiff and defendant entered into the articles of copartnership evidenced by defendant's Exhibit 1, and defendant paid the plaintiff the sum of $400 for a half interest in the business; that thereafter plaintiff and defendant as partners actively engaged in the barber business in the corporate limits of Monroe, N. C.

"4. That about the middle of March, 1914, the plaintiff purchased defendant's interest in the partnership business, paying him the sum of $400 in cash. That neither upon the said purchase of defendant's interest by plaintiff nor at any time since has defendant expressly stipulated or agreed that he would not reëngage in the business of barber in the corporate limits of Monroe.

"5. That about the last of March, 1914, and while the plaintiff was actively engaged in the business of barber in the corporate limits of Monroe, N. C., the defendant entered the employment of one James Keziah, who conducts a barber shop within the corporate limits of Monroe, N. C., in which plaintiff owns no interest. That defendant was actively engaged in the duties of his employment at the beginning of this action and up till the time of service of restraining order; that the plaintiff is likewise actively engaged in the barber business within the corporate limits of Monroe, N. C.

"Upon the foregoing facts the court is of the opinion, and so holds, that the contract of partnership mentioned in finding of fact numbered 3 is a discharge and abrogation of the contract under which the plaintiff seeks continuance of temporary restraining order, and the said temporary restraining order is hereby vacated and dissolved. It is further ordered and adjudged that the defendant recover of the plaintiff and his sureties the costs incident to the said restraining order."

Plaintiff appealed from this order.

*Adams, Armfield & Adams for plaintiff.*
*Vann & Pratt for defendant.*

WALKER, J., after stating the case: It may be premised that the articles of copartnership, dated 12 June, 1913 (Exhibit 1), contained no terms that expressly, or by necessary implication, abrogated the prior agreement of the parties, dated 15 December, 1902, by which the plaintiff, E. G. Faust, purchased from defendant, A. J. Rohr, the furniture and fixtures of the partnership theretofore existing between them, and which firm had conducted the business of barbers in the city of Monroe, N. C., and in which agreement the defendant, A. J. Rohr, covenanted with the plaintiff, E. G. Faust, "that he would not at any time thereafter engage in, directly or indirectly, or concern himself in carrying on or conducting the business of a barber, either as principal, agent, or servant, within the incorporated limits of the said city, so long as the plaintiff, E. G. Faust, may conduct or carry on the business of a barber therein."

But this statement is not to be understood as meaning that the said stipulation in the contract of 15 December, 1902, was not abrogated by the partnership articles, if the latter, otherwise, and from their very nature, should in law have such an effect.

The terms of the copartnership of 12 December, 1913, were of the usual character in such cases, providing for its formation, the interest that each of its members should have in its stock and property, the proportion in which losses should be borne, and generally for the proper and orderly management and conduct of its affairs, and finally for the manner of its dissolution and a just division of its assets and effects upon such dissolution.

So we have before us the question whether the mere formation of a partnership afterwards, for the purpose of carrying on the same kind of business, and conducting the business for the space of less than a year, should have the legal effect of a waiver or discharge of the negative covenant in the prior agreement. We do not think it should be so construed.

This Court has before had under consideration contracts of this sort, for the purpose of ascertaining their nature, validity, and the scope of their operation. *Baker v. Cordon,* 86 N. C.,

116; *Cowan v. Fairbrother,* 118 N. C., 406; *Kramer v. Old,* 119 N. C., 1; *Hauser v. Harding,* 126 N. C., 295; *King v. Fountain,* 126 N. C., 196; *Teague v. Schaub,* 133 N. C., 458; *Jolly v. Brady,* 127 N. C., 142; *Disosway v. Edwards,* 134 N. C., 254.

No question has been made as to the validity of this contract. In *King v. Fountain, supra,* the Court said with respect to this point: "The general rule was, and still is, that contracts in restraint of trade and the like are void, on the ground that they are against public policy, similar to contracts illegal and *contra bonos mores.* Clark on Contracts, 451-457. This rule has been modified in order to protect the business of the covenantee or promisee, when it can be done without detriment to the public interest. The reasonableness of such restraint depends in each case on all the circumstances. If it be greater than is required for the protection of the promisee, the agreement is unreasonable and void. If it is a reasonable limit in time and space, the current of decisions is that the agreement is reasonable, and will be upheld."

In *Downing v. Edwards, supra,* the place was New Bern, N. C., and the term twenty years. In *Jolly v. Brady, supra,* the territorial limit was Greenville, N. C., and the term one year. In *King v. Fountain, supra,* the limit was Greenville, N. C., and the time three years. The time in *Kramer v. Old, supra,* was practically indefinite, commencing after a certain date (1 September, 1891) and extending to the "full completion of the agreement," and the place was Elizabeth City, N. C. The contract in *Baker v. Cordon* was like the one in this case, the place being Tarboro, N. C., and the agreement as to the duration of the restraint being that "the defendant would not carry on the business in the time while the plaintiff was engaged in it." The contracts were upheld in those cases, the Court granting an injunction in *Baker v. Cordon,* and adjudging the defendant guilty of contempt in violating it. This was affirmed, upon appeal, by this Court.

The question is discussed at length in *Kramer v. Old, supra,* by *Justice Avery,* who thus stated the law: "Where the contract is between individuals or between private corporations, which

do not belong to the *quasi*-public class, there is no reason why
the general rule, that the seller should not be allowed to fix the
time for the operation of the restriction so as to command the
highest market price for the property he disposes of, should
apply. *Diamond Match Co. v. Roeber,* 106 N. Y., 473 ; *Morgan
v. Perhamus,* 36 Ohio St., 517 ; *Morse v. Morse,* 103 Mass., 73.
The stipulation on the part of James Y. Old, W. P. Old, and
W. N. Old, to quote the exact language of the contract, is 'that
they will not continue the business of milling in the vicinity of
Elizabeth City after 1 September, 1891, and the full completion
of this agreement.' The contract having been in other respects
performed, the agreement is now complete in the sense contem-
plated by the parties. The three defendants were at most re-
stricted from engaging in the business for the lives of each and
every one of them. Such a sale has been upheld upon reason
and authority in other courts. The plaintiff bought their right
to compete in their own persons in the business to which he suc-
ceeded as purchaser. It was not unreasonable that he should
insist upon the stipulation that none of the three should inter-
fere while they lived, by competition at the particular place men-
tioned, either with him as purchaser or his assignee in law or
in fact. In *Morgan v. Perhamus, supra,* the facts were that a
milliner sold her stock and good-will, and engaged 'not to carry
on the business *at any time in future* at the town of F. or
within such distance of said town as would interfere with said
business, whether carried on by said L. S. and P. or their suc-
cessors.' The agreement was held to be binding by the Supreme
Court, and the seller was enjoined from resuming business.
There, as in our case, the time was not described, except as an
inhibition on a particular person, with the implication that it
should extend to her life. The law would have construed the
contract as conferring the right to sell or transmit to a personal
representative as a part of the assets of his estate the property
bought, whenever the time was found to be coextensive with the
lives of the three defendants. *Cowan v. Fairbrother, supra;*
Clark Contracts, pp. 454, 455, and note, p. 456; 2 High Inj.,
sec. 1345; *Lewis v. Langdon,* 7 Sim., 442; *Bininger v. Clark,*

60 Barb., 113. In *McClary's Appeal,* 58 Pa. St., 51, the agree-
ment, which was held not to be unreasonable, was that a physi-
cian who had sold his business and good-will to another physi-
cian should 'never thereafter establish himself as a physician
within 12 miles (of his original place of business) without the
consent of the purchaser.' The contract there, like that under
consideration, could be fairly construed in no other way than as
operating for the term of the seller's life. These cases and
others are cited with approval by text-writers, and seem as a
rule to have established the reasonable doctrine contended for
by the plaintiff in the States as well as in England. 2 High,
*supra,* sec. 1180; 1 Beach Inj., secs. 462 to 470; *Whitaker v.
Howe,* 3 Bear, 383."

We are not now called upon to decide this question, as the
facts are not all before us, and we merely refer to the trend of
decision by this Court, as it may tend to shorten litigation.

The question immediately before us is the one we have stated,
and we will proceed to consider it, and we think that, by reason
and authority, our answer to it, already given, is fully sustained.
It is well understood in the law that an agreement should re-
ceive that construction which will best effectuate the intention
of the parties; and this intention must be collected, not from
the detached parts of the agreement, but from the whole thereof.
Greater regard is to be had to the clear intent of the parties
than to any particular words which they may have used in the
expression of their intent. Where the intention clearly appears
from the words used, there is no need to go further, for in such
a case the words must govern; or, as it is sometimes said, where
there is no doubt there is no room for construction. But if the
meaning is not clear, the Court will consider the circumstances
under which the contract was made, the subject-matter, the
relation of the parties, and the object of the agreement, in order
to ascertain their intention, and for this purpose parol evidence
is admissible. Clark on Contracts (2 Ed.), p. 403. "It is a
general rule applicable to all contracts in restraint of trade, that
the first duty of the court is to interpret the covenant or agree-
ment itself, and to ascertain according to the ordinary rules of

construction what is the fair meaning of the parties. It has often been asserted that contracts in restraint of trade are against public policy and therefore presumably bad; and that their provisions should not be extended by construction or implication so as to favor persons desiring to enforce them beyond what the terms would clearly require. This rule of construction has been handed down from the old cases, and is founded upon the idea that there is something intrinsically vicious in a contract restraining liberty of trade; but the more recent cases, especially in the more liberal jurisdictions, have denied the existence of any presumption against such contracts, but recognize them as entirely valid and legal, and interpret them not only without any adverse bias, but in such a way as to effectuate rather than defeat them. Contracts which at one time would have been considered void *in toto* are now treated as severable as possible, and the legal portion allowed to stand. The legal restraint is not implied from doubtful words, and there is a decided disposition to set aside the arbitrary and narrow rules of construction once prevalent in favor of greater liberty and breadth of view. Such a contract is to be construed in the light of its subject-matter and the conditions under which it was made, the situation of the parties, the nature of their business, the interests to be protected by the restriction and its effect upon the public." 24 A. and E. Enc. of Law, p. 857.

When we interpret this contract in the light of these rules, we find little difficulty in reaching what we regard as the right conclusion.

The object of the plaintiff in making the contract was to prevent competition on the part of the defendant, either directly or indirectly, either as principal or servant, and this must have been well understood by the defendant. It was to suppress rivalry between the two men, as barbers, and this formed a material part of the consideration or inducement for making the agreement.

If the intention and purpose of the parties was the prevention of competition, and no other can be deduced from the plain terms of the agreement, then it cannot be that the formation of

the second copartnership was an abrogation of this stipulation in the contract for the dissolution of the former copartnership, which contained the negative covenant, and for the simple reason that by becoming the plaintiff's partner, the defendant in no way was brought into competition with him, but the opposite result would necessarily follow. While the new copartnership lasted, they worked in harmony, the interest and advantage of one extending to both, and there was, therefore, no conflict of interests; but it would have been otherwise had the two been pitted against one another in a business rivalry, each of them striving for the mastery, and this is what the covenant was manifestly intended to prevent.

But the question has undergone careful consideration by the Supreme Court of New Jersey (whose opinions are entitled to the greatest respect), in *Scudder v. Kilford*, 57 N. J. Eq., 171. That case is so instructive and so exactly in point, so convincing in its reasoning and logically so conclusive, that we cannot do better than to quote the pith and substance of it, omitting less important parts. The *Vice Chancellor* said:

"The contention of counsel for the petitioner is that subsequent to the making of the decree the complainant, by taking the defendant into partnership, and so permitting him to carry on the enjoined business, abandoned his right under the original agreement. It is not stated that the complainant, upon entering into the partnership relation with the petitioner, expressly agreed that the former covenant should be rescinded. Nor at the termination of their relation was there any agreement to that effect. The waiver or abandonment of the previous agreement, it is insisted, arose from the fact that they entered into a partnership to transact the same kind of business, and then dissolved their partnership relation. The line of reasoning by which this result is put forward is, that the covenant by which the petitioner bound himself not to transact business in Princeton was equivalent to a sale to complainant of the good-will of the business which petitioner then sold to complainant; that when they entered into partnership this good-will became a part of the property or assets of the firm, in which the petitioner

acquired an equal interest; that upon dissolution of the firm a moiety of this interest remained his property, and entitles him personally to engage in the same business. It seems to me that this line of argumentation is defective. The negative covenant entered into by the petitioner, by which he bound himself not to engage in the same business within the borough, was of much more consequence than a mere sale of the good-will of the business to Mr. Scudder. The sale of the good-will would have only precluded the vendor from soliciting trade from the old customers of the firm, but would not have prevented him from setting up a rival business in Princeton or anywhere else. *Labuchere v. Dawson,* L. R., 13 Eq., 322; *Newark Coal Co. v. Spangler,* 8 Dick. Ch. Rep., 354; *Althen v. Vreeland,* 36 Atl. Rep., 479. By virtue of the contract, Scudder therefore got much more than the 'good-will,' namely, the right to prevent Kilfoil from soliciting the old customers of the business; he got a right to exclude Kilfoil from doing any business at all in the same line in the same place. If Scudder had entered into partnership with a third person, no right to enforce Kilfoil's covenant would have passed to the partnership, but would have remained the sole right of Scudder, the covenantee. So, when Kilfoil became a partner, he obtained no interest in the covenant as such partner which could annul his obligation as covenantor. The question, then, is reduced to this, Did the consent by Scudder, that Kilfoil should engage in the same business in Princeton, as his partner, imply a waiver of his rights under the contract? I am clear that it did not. The two contracts were not incongruous or inconsistent. The covenant in the original contract provided against Kilfoil entering upon the same business in rivalry with Scudder. The permission implied by the partnership arrangement was that he might engage in the same business in copartnership with Scudder. If Scudder had hired Kilfoil to assist him in his business, I do not see how this could be tortured into a consent that the latter could work for himself. Now, their relation as partners, both interested in the business of the firm, made the consent of Scudder that Kilfoil should so work as partner of much the same quality as would have been his

assumed consent that Kilfoil should work as his servant. His consent in the latter case would have been that he could work for Scudder; in the former, that he could work in the interest of Scudder. To this extent only was there a consent that Kilfoil should engage in business while Scudder was still in business. When Kilfoil ceased to be a partner, and even that consent was withdrawn by the cessation of the firm relationship, he had acquired no right to engage in business on his own account, in contravention of the terms of his original contract."

It is apparent from a careful reading of the contract under interpretation in this case that the defendant, A. J. Rohr, did not merely sell his "good-will in the business," but went further, and specifically contracted not to enter the business, or concern himself in the business, of barber, directly or indirectly, as principal or agent, in the limits of the city of Monroe, as long thereafter as the plaintiff Faust should be engaged in such business in Monroe. The courts have said that the latter covenant is a much more solemn and far-reaching one than the mere sale of good-will. The good-will of a trade or business may be defined as the advantage or benefit which is acquired by an establishment beyond the mere value of the capital stock, funds, or property employed therein, in consequence of the general public patronage and encouragement which it received from the constant or habitual customers, on account of its local position or common celebrity, or reputation for skill or affluence, or punctuality, or from other accidental circumstances or necessities, or even partialities or prejudices. 14 A. and E. Enc. of Law (2 Ed.), p. 1085. It has been stated to be a general rule that good-will exists in a professional as well as in a commercial business, subject to the distinction that it has no local existence, like the good-will of a trade, but attaches to the person of a professional man as a result of confidence in his skill and ability. Consequently, in enforcing the agreement where there has been nothing more than a mere sale of "good-will," the courts at most have only held that the vendor of the good-will is precluded by his contract from soliciting the former customers of the old partnership to deal with himself or not to deal with his vendee. 14 A. and E. Enc. of Law, p. 1091.

It appeared in *Foss v. Roby,* 195 Mass., 292 (10 L. R. S. (N. S.), 1200), that the defendant sold his good-will in the dental profession to the plaintiff, the two having been theretofore partners in the business. Thereafter the plaintiff went into bankruptcy. After the bankruptcy, plaintiff entered into business with another, assigning to the new firm his rights to keep the defendant from competing which he had acquired under the contract before mentioned between plaintiff and defendant. After this, plaintiff again engaged in business for himself as dentist, taking an assignment to himself, from the firm of which he had been a member, of rights against the defendant under the said contract. Defendant Roby then resumed business as a dentist in the territory in question. Plaintiff brought suit to enjoin him from interfering with his rights. The Court held that the right, as against the defendant Roby, which the plaintiff had to the good-will of the dental business in the specified territory, was an assignable property right, and its assignment by the plaintiff to the firm of which he was a member, as well as the subsequent assignment by this firm to the plaintiff, were valid; that the rights of the plaintiff were not affected by his having gone into bankruptcy, and, further, that the plaintiff was entitled to injunctive relief.

Faust's employment of Rohr after the first contract, and later his association with him as partner, was nothing more than a temporary license to him to engage in business as a barber in Monroe, and it was subject to the condition that Rohr should be considered as an employee or partner of Faust. Certainly there was nothing in these subsequent contracts that permanently released Rohr from his first contract not to compete, as principal or agent, with Faust in the city of Monroe. A rescission would not take place unless there had been some subsequent agreement or conduct inconsistent or incompatible with the restrictive covenant. The acceptance of the resignation of an employee before the term of employment fixed by the contract expires does not abrogate such employee's restrictive covenant, but leaves the parties in the same situation as they would have been at the end of the term if the employee had then left the

employer's service. Nor does the employer's consent that the employee shall enter the service of another release his restrictive agreement for the future time. 24 A. and E. Enc. of Law (2 Ed.), 856-857. And again: Where it is claimed that a contract has been discharged by a new contract, or by the introduction of new terms, the intention to discharge the original contract must distinctly appear, to give rise to such an implication, from the inconsistency of the new terms with the old ones. A mere postponement of performance for the convenience of one of the parties does not operate as a discharge. Clark on Contracts, pp. 612, 613. That contracts of this and a similar restrictive nature will be enforced by the courts and a violation of them enjoined is, it seems, well settled. *Gordon v. Knott,* 199 Mass., 173 (*s. c.,* 19 L. R. A. (N. S.), 762 and note). This Court has often enforced them and issued restraining process to prevent their infringement. See *Baker v. Cordon* and other cases cited, *supra.*

The defendant's counsel, in a learned and well prepared brief, have controverted these positions taken by the plaintiff and now approved by us. It will be found, though, that their authorities relate mainly to contracts for the sale of the good-will of business concerns, without any negative covenant, such as we have here. Those authorities hold that the sale of the good-will merely will not prevent the vendor from engaging in a competitive business, except in so far as it would interfere with the due enjoyment of the thing sold. As an illustration of this principle, it was decided in *Foss v. Roby, supra,* that one selling the good-will of a dental business impliedly undertakes that he will not thereafter practice his profession so as to destroy or injure the business he has sold, wherefore he will not be permitted to establish himself in the same business and solicit the patronage of his former patients, for that would be in direct opposition to his former promise, and a breach of the contract. *Hoxie v. Chaney,* 143 Mass., 592; *Yeakly v. Gaston,* 111 S. W. Rep., 768; *Dwight v. Hamilton,* 113 Mass., 175. It is frankly conceded in their brief that "the sale of the good-will of a business will not, of itself, be sufficient to preclude the seller from engaging in a separate and independent business of the same kind in the same

village or city," and "whenever such is the intention of the par-
ties, that is, to prevent the vendor from engaging in the same
kind of business in the same place upon the sale of the good-will,
it is accomplished only by an express stipulation to that effect,
which, if not in undue restraint of trade, will be valid and bind-
ing; and upon such a sale of the good-will of a business, without
more, the vendor is not precluded from setting up a similar busi-
ness in the vicinity. If the vendee wishes a more beneficial
stipulation and greater restraint upon the vendor, he must see
to it that provision for that purpose is inserted in the contract.
20 Cyc., 1279; *Hoxie v. Chaney,* 143 Mass., 592; 24 Am. Digest,
p. 2650, where the cases are collected. But the learned counsel
cite and rely mainly on *Norris & Cochran v. Howard,* 41 Iowa,
508, and the conclusion of the Court, founded upon facts sub-
stantially the same as those in this case, supports the defendant's
contention; but we think the reasoning of the Court is fallacious
and the deduction therefrom is unsound. The Court clearly
loses sight of the precise nature of the ·stipulation forbidding
the vendor from engaging in similar business and of the object
for which it was inserted in the contract, and therefore it was
led into the error of assuming that "it formed an impediment to
his becoming a partner" with his vendor. If we admit the
premise, that it does, the conclusion may well be warranted; but
this is a false assumption, as we respectfully think, for the object
was the prevention of competition, and he does not become a
competitor by entering the copartnership. We are much better
satisfied with the reasoning and statement of the law as con-
tained in the case of *Scudder v. Kilfoil,* 57 N. J. Eq., 171, to
which we have referred. We are not inadvertent, though, to
the clear distinction drawn in *Norris & Cochran v. Howard,*
*supra,* between the sale of the good-will of a business and a
restrictive covenant like the one found in this contract, which
is as follows: "The agreement not to buy grain in Prairie City,
nor thereafter to engage in such business at that place, is a
thing distinct from the transfer of the mere good-will. The legal
meaning of good-will, as defined by *Lord Eldon,* 'is nothing more
than the probability that the old customers will resort to the old

place.' 'It is nothing more than a hope, grounded upon a probability.' Parsons on Partnership, 2 Ed., p. 273. 'The sale of a good-will, in the absence of any express stipulation, does not preclude the seller from setting up the same kind of business in the same neighborhood, if he do not describe himself as setting up the identical business that has been purchased.' Smith's Mercantile Law, p. 252, and cases cited." While this is a correct statement of the law, so far as it goes, it was not carried to its legitimate and logical sequence by proper argument and by keeping in mind the true nature and intended purpose of the stipulation against engaging in a similar occupation.

This also disposes of the position taken in the brief of defendant's counsel, that there is a necessary repugnancy between the said express stipulation and the subsequent agreement of partnership, for which they rely on *Redding v. Vogt,* 140 N. C., 562, and *Burns v. McFarland,* 146 N. C., 384, in the former of which cases it was said: "When the parties to a contract come to a fresh agreement of such a kind that the two cannot stand together, the legal effect of the second agreement is to rescind the first"; and in *Myers v. Carnahan,* 61 W. Va., 414, also cited by them: "A subsequent contract which does not, by express terms, abrogate an earlier one, will operate as a discharge of it, in the absence of an express agreement to that effect, when clearly inconsistent with the continued existence of the original contract." But here we come back to the original proposition, that the two contracts are not inconsistent when properly considered and construed, and the whole argument is based upon the false premise that they are. The quotation from 20 Cyc., 1281, is founded solely upon the authority of the Iowa decision, which we are unable to follow, as we consider it at variance with reason, a broad view of the contract and the clear intention of the parties.

There was error in vacating the preliminary injunction. The court should have continued it to the hearing.

Reversed.