## MASTERS et al. v. BROOKS.

(Supreme Court, Appellate Division, First Department. June 11, 1909.)

1. PARTNERSHIP (§ 5*)—CREATION AND REQUISITES—PARTNERSHIP DISTINGUISH-
ED FROM OTHER AGREEMENTS.

An agreement, formed at the expiration of a partnership agreement, between plaintiffs and defendant, by which defendant was to conduct the business formerly conducted by the partnership and pay a certain percentage to plaintiffs, is not a partnership agreement.

[Ed. Note.—For other cases, see Partnership, Cent. Dig. § 15; Dec. Dig. § 5.*]

2. PARTNERSHIP (§ 300*) — ACCOUNTING — PROPERTY AND TRANSACTIONS IN-
CLUDED.

Plaintiffs, who were custom house brokers, formed a partnership with defendant to carry on in the name of F. W. B., the defendant, the business of a revenue attorney. Defendant was to devote his entire time to the business, which consisted in attempting to secure the return of excessive duties paid, and plaintiffs were to assist in procuring business. Plaintiffs were to have one-half of the net income and a one-half interest in all contracts. During the existence of the partnership the business of a deceased revenue attorney was acquired. After the partnership expired by limitation, a new agreement was entered into, under which plaintiffs were to receive 40 per cent. of the net profits of F. W. B.'s business, and this agreement was also terminated by notice, as agreed, after about a year, and defendant continued to practice as a revenue attorney. Held that, after the expiration of the original agreement for a partnership, the right to use the name of F. W. B. was not a firm asset or a part of the good will of the partnership, which would require defendant to account for the agreed percentage of fees earned by him by his individual labors after the relations between the parties had terminated, but that the accounting between them must include for one-half of the net profits derived from the business in which protests were filed before the expiration of the partnership agreement and one-half of the net profits of the business of the deceased attorney regardless of when protests were filed, and that in ascertaining the net profits defendant must be allowed expenses, including gratuities paid brokers to influence business.

[Ed. Note.—For other cases, see Partnership, Dec. Dig. § 300.*]

3. GOOD WILL (§ 1*)—ELEMENTS AND INCIDENTS.

There cannot be a good will in a business which depends for its existence on the professional qualities of the person carrying it on.

[Ed. Note.—For other cases, see Good Will, Cent. Dig. § 1; Dec. Dig. § 1.*]

4. PARTNERSHIP (§ 346*)—ACCOUNTING—ACTIONS—COSTS.

The costs and expenses of a reference on a partnership accounting are properly chargeable against partnership assets.

[Ed. Note.—For other cases, see Partnership, Cent. Dig. § 820; Dec. Dig. § 346.*]

Clarke, J., dissenting in part.

Appeal from Judgment on Report of Referee.

Action by Joseph W. Masters and another against Frederick W. Brooks. From a judgment for plaintiffs, both parties appeal. Modified and affirmed.

Argued before INGRAHAM, McLAUGHLIN, HOUGHTON, CLARKE, and SCOTT, JJ.

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

Jacob Fromme, for plaintiffs.
James Russell Soley, for defendant.

SCOTT, J. These are cross-appeals from a decree entered upon the report of a referee in an action for a partnership accounting. The plaintiffs in the year 1897 were custom house brokers. The defendant had been employed for a number of years in the custom house and in the office of the United States attorney for this district, and had acquired an especial knowledge of custom house business, of the revenue laws, and of the treasury practice and regulations affecting importations and the levying and imposition of duties. A new tariff bill was enacted in 1897, and in contemplation of its passage, and of the many difficult and disputed questions which would probably arise under it, plaintiffs and defendant, on April 23d, 1897, entered into a copartnership agreement. It was agreed that the partnership should be for five years, and should be conducted under the firm name of Frederick W. Brooks. The firm was to—

"carry on the business of what is commonly known as revenue attorneys; that is to say, acting for merchants who claim or for whom it is claimed that the government of the United States, or those representing it, illegally exact duties from merchants or importers who are overcharged by the government or those representing it for alleged duties on imports."ʻ

The plaintiffs are designated in the articles as parties of the first part, and defendant is designated as party of the second part. The work for which the partnership was formed was quasi professional in its nature, involving, on the part of the person carrying it on, not only personal labor, but especial skill and technical knowledge, which, from the nature of his training and experience, it was supposed that defendant possessed. The business of custom house broker, in which plaintiffs were engaged, was of an entirely different nature, and called for none of the above-mentioned qualifications. It was agreed that defendant should devote his whole time and attention to the business of the partnership. No such obligation was imposed upon plaintiffs, who were left free to devote their time and attention to their business of custom house brokers, but they agreed to procure for the firm all the business they could. They also agreed to furnish all the financial assistance the firm might require, including the guaranty of a fixed income to defendant. After the payment of all expenses the net profits were to be divided equally; plaintiffs being entitled to one-half and defendant to one-half. It was agreed that all contracts entered into by the firm with merchants, importers, and others in the firm name should belong to the copartnership; plaintiffs having an—

"individual one-half interest in said contracts as soon as the same are respectively executed in the same manner and form as if one-half interest in said contracts, when made, are and each of them is assigned to said parties of the first part."

The firm at once entered upon an active and profitable business. That business consisted of attempting to obtain from the government refunds of duties which were claimed to have been illegally exacted. This involved a consideration of the tariff law, of the proper classification and appraisement of imported articles, the effect of treaty obliga-

tions between this country and other countries, and the like. The fees paid to revenue attorneys are contingent upon success, consisting of an agreed percentage, usually 50 per cent., of the amount of the refund secured. Cases were brought to the partnership either by the merchant or importer himself or by his agent or custom house broker. In each case the plaintiffs received a record of the preliminary facts, which were entered upon a slip called a "protest slip," which contained, so far as the data were available, the name of the importer, the entry number, the bond number, a description of the goods, the marks and numbers, the name of the vessel, whence imported, the date of the invoice, the date of entry, the date of payment of the duty, the rate of duty charged, the amounts claimed to be excessive, the kind of entry, the time liquidated, and the date of the protest slip itself. Upon the receipt of a request, with the necessary data, the partnership filed a protest, which served as the commencement of a proceeding to obtain a refund of the duties. In due course such protest was sent by the collector of customs to the Board of Appraisers, which thereupon proceeded to hear and determine the case. It was the defendant's duty to present to this board such testimony and evidence as he deemed necessary to sustain the claim of his client, together with an oral argument, and as a rule a written brief giving the law applicable to the case, as he considered, with a reference to decisions of the courts. The proceedings before the board consisted of the examination and cross-examination of witnesses, including experts, and oral and written arguments, precisely as cases are tried in courts of law. From the decision of the Board of General Appraisers appeals were frequently taken to the federal courts, even to the Supreme Court of the United States, so that a final decision and actual refund were often delayed for years after the filing of the protest. The defendant was not admitted to the bar until after the termination of the partnership; but he attended to all the partnership cases before the Board of General Appraisers, consulted with clients and their brokers, prepared papers on appeal when necessary, and on such appeals prepared briefs. He did not appear as counsel or attorney of record in the federal courts, but did the work of preparation connected with the cases.

The partnership expired by limitation on April 30, 1902, and was not renewed or extended. At this time there were pending a considerable number of unfinished cases, in which protests had been filed during the lifetime of the partnership. A new agreement was then entered into between the firm of J. W. Masters & Co., composed of plaintiffs and one George W. Masters, and defendant, whereby it was agreed that said J. W. Masters & Co.—

"shall be entitled to 40 per centum of the net profits of the business of Frederick W. Brooks which shall be derived from protests filed during that period against the actions of officers of the customs."

The firm of J. W. Masters & Co. agreed to procure for defendant—

"all the business they can influence, both from the customers of their firm and from others as well."

At the same time defendant agreed to give to J. W. Masters personally, during the lifetime of this last agreement, 10 per cent. of his net

profits. This agreement lasted only until May 21, 1903, when it was terminated in accordance with its terms by a notice from defendant. The defendant removed to other offices from those which he had previously occupied and which had been contiguous to plaintiffs' offices. He continued to prosecute to a termination pending cases commenced by the filing of protests during the lifetime of the firm and during the continuance of the subsequent agreement, except a comparatively few cases, which plaintiffs prosecuted. Defendant continued to pursue the calling of a revenue attorney, accepting such cases as were brought to him, whether by those who had been clients of the partnership or by new clients, who had never had dealings with the partnership. Plaintiffs also sought and procured such cases as they could and prosecuted them.

There can be no doubt that the partnership between the plaintiffs and defendant came to an end on April 30, 1902. Not only do the articles of copartnership expressly so provide, but the subsequent agreement entered into between the parties is entirely inconsistent with any idea that the partnership was to be renewed or continued. That agreement was distinctly not a copartnership agreement, but was merely an agreement to pay plaintiffs' then firm a percentage of the net profits which defendant might earn in an individual business. The referee, however, has held the defendant liable to account to plaintiffs for all fees realized by him from the date of the expiration of the partnership to the date of his report, whether resulting from protests filed before or after the expiration of the partnership, and whether coming from those who were clients of the firm or those who never had any business relations with it. At the same time he has exonerated plaintiffs from accounting for any fees resulting from protests filed after the termination of the copartnership. His ground for this holding can best be stated in his own language, as follows:

"As I understood the theory of this case, it is this: That Mr. Brooks has appropriated the good will of the business created by the parties in interest who make up the parties to this suit, without settling up the business, and that for that reason, under the case of Mitchell v. Reed (the Hoffman House Case) 61 N. Y. 123, 19 Am. Rep. 252, and 84 N. Y. 557, he is called upon to account for the business of Brooks & Co. until it is legally settled up."

This ruling, as we understand it, is based upon the fact that the copartnership adopted as its firm name the individual name of the defendant, whence the deduction is drawn that the right to use that name became a partnership asset and a part of the good will of the firm. Hence it is argued that the plaintiffs are entitled to one-half of the net profits of all business done by defendant in his own name. The logical result of this argument would be that, unless defendant changes his name, he must pay plaintiffs half of his earnings for the rest of his life; for it would be manifestly impracticable to put up at auction and sell to a stranger the exclusive right to use defendant's name. This ruling constituted the fundamental error in the referee's report.

The case of Mitchell v. Reed, upon which alone he relies, bears no resemblance in its facts to the present case, except that both involved a partnership accounting. In that case the defendant, during the continuance of the partnership, had secretly arranged for a new lease in

his own name, after the expiration of the existing lease. The good will there sought to be appropriated was the good will attached to the locality to which the customers were used to resort, and not the good will attached to the use of the names of the copartners. It was held that this constituted a fraud upon the copartner, and defendant was compelled to account as if the new lease had been made to the firm. Nothing of the sort appears in the present case. It is not charged that, during the continuance of the partnership, defendant acted in any wise contrary to his duty to his partners. After the dissolution each partner was to do such work as he could procure, and in so doing he committed no wrong towards his former partners. It is quite clear that the right to use the defendant's name was not a firm asset, in which plaintiffs had or have any property right. Meneely v. Meneely, 62 N. Y. 427, 20 Am. Rep. 489; Helmbold v. Helmbold Mfg. Co., 53 How. Prac. 453; Cutter v. Gudebrod Bros. Co., 36 App. Div. 362, 55 N. Y. Supp. 298.

Nor is the business carried on by defendant for the partnership one in which the right to use the individual name of a partner constitutes an element of the good will. As has been said, the business was quasi professional in its character, closely analogous to that of a lawyer, and involved for its successful prosecution the personal skill, learning, and experience of the person pursuing it. The good will, therefore, which was borne to plaintiff, while a member of the firm, by its clients, depended upon purely personal qualifications, not separable from the individual who carried on the business of the firm. There cannot well be such a thing as a good will, strictly so called, of a business which depends for its existence upon the professional qualities of the person who carries it on. The distinction between the property value attaching to the firm name of a trading or commercial partnership and that attaching to the name of a partnership the business of which depends upon the personal characteristics of the individual partners is well pointed out by Mr. Justice Bischoff in Read v. Mackey, 47 Misc. Rep. 435, 95 N. Y. Supp. 935, as follows:

"With the growth and extension of trade the courts recognize the fact that a firm name may be so used as to become impersonal to the individuals conducting the business, and in course of time indicates commonly the kind or quality of the article made or dealt in, rather than the personal attributes of the makers or dealers, and that in such a case the firm name, since its use would no longer tend to deceive, may properly be deemed a part of the good will, to be transferable with and as a part of the latter. This view culminated in this state in the decision of our court of last resort in Slater v. Slater, 175 N. Y. 143, 67 N. E. 224, 61 L. R. A. 796, 96 Am. St. Rep. 605, which was to the effect that the business name of a firm of shoe manufacturers and dealers was a part of the good will of the business, subject to compulsory sale with the good will upon the death of one of the partners for the benefit of his estate. * * * At most, therefore, the adjudication last alluded to is authority for the contention that, in the case of tradesmen, where the firm name has ceased to point to the personal attributes of the partners and has become impersonal to them, it will constitute a part of the good will, and is capable of transfer to and for the use of the purchaser of such good will. * * * From what has been said it follows that, while a firm name may in some cases be deemed a part of the good will of a business, it is not of itself and necessarily a part of the good will, and that, while in trade it may under some circumstances be such, it cannot become a part of the good will in case of a business which depends upon the personal attributes of the partners engaged therein, such as

professional partnerships. * * * In my opinion there is no basis for a distinction between a partnership name of a banking business and a professional partnership for the purposes of the present question. Each is equally distinquishable from a manufacturing or trading partnership, so far as the inclusion of the firm name in or from the good will is made to depend upon the personal qualities of the members of the firm."

We think that it is entirely clear that there was no property right in the use of the defendant's name which constituted a firm asset for which he is called upon to account in any form. After the dissolution of the partnership he was entitled to carry on business in his own name, even with those who had been clients of the copartnership, providing he used no unfair means (of which there is no claim) to lead such clients to believe that they were still dealing with the original firm.

A question has been raised as to what business the defendant is called upon to account for. The third clause of the copartnership agreement, which has already been quoted, gave to plaintiffs a one-half interest in all contracts made between the firm and merchants, importers, or other persons. This, of course, referred to contracts made during the continuance of the copartnership. As to such contracts either partner who carried them out to completion and realized the profits was a liquidating partner and bound to account to his copartners. King v. Leighton, 100 N. Y. 386, 3 N. E. 594. The question is: What constituted such contracts? The manner in which business was brought to the firm has already been explained, and all parties are agreed that as to cases in which the protests were filed during the lifetime of the partnership—that is, prior to May 1, 1902—but which were brought to a conclusion afterwards, either partner who received the fees arising therefrom is bound to account. During the continuance of the copartnership the firm obtained from certain merchants and importers documents in the form of powers of attorney, which recited that the signers thereof had been informed that the collector of customs had exacted and would continue to exact excessive and illegal duties. Thereupon the signers constituted and appointed Frederick W. Brooks (meaning the firm) to act as attorney and agent for said signers and do such to recover by suit or otherwise the amount of duties illegally exacted, stipulating that in case of failure no costs or expenses should be incurred by the signer, but that in case of success the firm should receive 50 per cent. of the amount collected. These instruments are so drawn as to apply to future as well as present employments, are revocable at will, and bind the signers to nothing except to pay the firm 50 per cent. of the amount recovered in any case that may thereafter be entrusted to it. Culver v. W. U. Tel. Co., 50 N. Y. 691.

The plaintiffs claim that these powers of attorney are in the nature of continuing retainers, and constituted the "contracts" which the parties had in mind when they agreed upon the third clause of their copartnership articles, and that the defendant should account as liquidating partner for all fees received from business done under the authority of these powers, whether the protests were filed after or before the dissolution of the partnership. A majority of the court are of opin-,

ion that these powers cannot be considered as contracts of employment in any sense, that they merely express the terms upon which the business is to be done if and when the attorney is actually employed in any given case, and that the completed contract of employment took effect as to each case only when, as to any particular entry or importation, the attorney was instructed to file and did file a protest. It follows, upon this construction, that the only business done and fees received after the dissolution of the partnership for which either partner is called upon to account are those cases in which protests were filed prior to May 1, 1902.

The copartnership, during its continuance, acquired by assignment the business, existent and prospective, of a deceased revenue attorney named Wright. Some of this business was begun by the filing of protests, work done, and fees realized therefrom by defendant after the dissolution. Without going into a careful analysis of the contract, it is sufficient to say that we are agreed that the contract was a copartnership asset, and that defendant has been properly charged with one-half of the profits derived from and traceable to this source, irrespective of when the protests were actually filed.

There are other disputed questions, which may be briefly disposed of. The referee has allowed to defendant 9.45 per cent. of the net fees for which he holds him accountable as the fair proportion of his office expenses properly chargeable to the plaintiff. To this plaintiffs object. The defendant was bound to account to plaintiffs only for the net fees received, and to ascertain these net fees the expenses of earning them must be considered. In previous accountings between the parties such expenses were voluntarily allowed. The plaintiffs also object to gratuities paid to brokers who influenced the business. The evidence shows that it was a prevailing custom to allow such gratuities, and the agreement of May 1, 1902, was in effect a contract to pay gratuities to plaintiffs for influencing business. Such gratuities were also allowed in firm's accounting. The referee has included in the accounting the fees realized from May 1, 1902, to May 21, 1903, while the contract to pay J. W. Masters & Co. 40 per cent. and J. W. Masters individually 10 per cent. of defendant's net earnings was in force. Strictly speaking, this account is not within the issues raised by the pleadings; but as the account has been taken, and there is no dispute as to the figures, the accounting may be deemed as included in the judgment.

Our conclusions, briefly stated, are as follows: First, that the plaintiff and defendant are called upon to account for fees received in all cases in which protests were filed prior to May 21, 1903; second, that they are called upon to account for all fees received in cases covered by the so-called Wright contract whenever the protests were filed; third, that defendant is not called upon to account for fees received in cases in which protests were filed after the dissolution of the partnership and the expiration of the subsequent agreement, whether such cases were intrusted to him by new clients or by those who had been clients of the copartnership during its continuance; fourth, that the defendant is entitled to charge, as a copartnership expense, the gratuities paid to brokers through whom business was obtained, which seems to be

justified by the custom of the trade and by the former acquiescence of the plaintiffs; fifth, that defendant is entitled to charge, as a copartnership expense, a fair proportion of his office expenses, based upon a comparison between his total business during the accounting period and the business for which he is required to account; sixth, that the costs and expenses of the reference on the accounting were properly charged against the copartnership assets.

All the facts and figures relating to the business have been so fully found by the referee that it is possible to recast the account in accordance with the foregoing conclusions without putting the parties to the expense of another reference.

| | | |
|---|---:|---:|
| The account filed with the referee, which included only fees from business done by defendant upon protests filed prior to May 1, 1902, and which was not impeached, showed net receipts of.................... | | $ 9,788 59 |
| It appeared that after that account was made up defendant received fees upon business founded on protests filed prior to May 1, 1902, including business covered by the Wright contract....................$12,546 67 | | |
| The proportion of office expenses chargeable against this sum on the basis adopted by the referee is...... | 1,185 77 | $11,360 90 |
| There was collected by defendant on cases in which protests were filed between May 1, 1902, and May 22, 1903, including business covered by the Wright contract .........................................$11,375 62 | | |
| And there was collected on cases arising under the Wright contract in which protests were filed after May 21, 1903.................................. | 3,560 34 | |
| | $14,935 96 | |
| Less proportion of office expenses....................$ 1,379 25 | | $13,538 71 |
| Making total fees to be accounted for by defendant..... | | $34,688 20 |
| The defendant concedes that certain minor adjustments require this sum to be increased by................ | | 277 85 |
| And the agreed value of the law library retained by defendant is agreed to be........................... | | 295 50 |
| Making the total amount to be accounted for by defendant ..................................... | | $35,261 55 |
| Of which one-half is.................................. | | $17,630 78 |
| Against this is to be credited one-half of the fees collected by plaintiffs for which they are concededly liable .........................................$ 3,254 53 | | |
| And one-half of the referee's and stenographer's fees paid by defendant.................................. | 1,246 22 | 4,500 75 |
| Leaving net amount due from defendant............. | | $13,130 03 |

The judgment appealed from will be modified accordingly, and, as modified, affirmed, with costs and disbursements to the defendant to be paid out of the partnership funds in his hands, and deducted in equal proportions from the shares of the plaintiffs and defendant. The order will be settled on notice, when any error that may have been made in the foregoing calculations can be corrected.

INGRAHAM, McLAUGHLIN, and HOUGHTON, JJ., concur.

CLARKE, J. (dissenting in part). The business which the partnership was formed to conduct was peculiar and technical. All the parties were thoroughly conversant therewith. The plaintiffs were experienced custom house brokers. The defendant had been long connected with the customs service and knew the intricacies of revenue litigation thoroughly. When these parties got together to make their agreement, they knew what they were talking about, and the language used must be interpreted in the light of the nature of the business it was intended to cover and their acquaintance therewith. The third clause of the partnership agreement provides:

"Said party of the second part further agrees that all contracts made with merchants or importers or any other persons in the name of Frederick W. Brooks belong to said copartnership, and that said parties of the first part have an undivided one-half interest in said contract as soon as the same are respectively executed in the same manner and form as if one-half interest in said contract when respectively made are and each one of them is assigned to said parties of the first part."

I disagree with the majority of the court in the interpretation of that clause of the partnership agreement. The point of dispute is the meaning to be ascribed to the word "contracts." A new tariff law was about to go into effect. Numerous controversies between the government and importers were bound to arise. It was in view of that certainty that the partnership was made. The duties as liquidated had to be paid by the importers upon entry and before delivery. To preserve their rights, protests in each instance were required to be filed at the custom house within 10 days. With protests duly filed any decision made in any case at any time favorable to any importer would apply to all like goods so protested. So all parties knew that any importer who began to protest upon a given line of goods, or against a particular decision, must go on protesting on all importations involving the same question, or he would take nothing by an ultimate favorable decision. Papers were therefore drawn, signed, sealed, and witnessed by various importers and delivered to the partnership as follows:

"Whereas, we are informed and believe that the collector of customs has exacted and will continue to exact duties under section 1 of the act of July 24, 1897, *on goods covered by the reciprocity treaties with Portugal, Germany, Italy and France* (or, in another case, "cordials, bitters and other goods described in paragraph 292 of the act"; or, in another, "parts of knives at the same rate as that provided for completed knives, as provided in paragraph 153"): Now, therefore, we, the undersigned, both on account of ourselves as consignees and whom it may concern as consignors, do make, constitute, and appoint Frederick W. Brooks, of 27 William street, New York City, our true and lawful attorney and agent, for us and in our names, places, and stead to recover by suit or otherwise the amount or amounts of duties so exacted from us contrary to said existing laws, and for which information and services he shall receive a fee of 50 per cent., or one-half, of any and all amounts recovered; but in case nothing is so recovered we shall be liable for no costs or expenses whatever in the matter—hereby granting to our said attorney full power and authority to collect and receive all moneys due us in connection therewith, to give for us and in our names all requisite receipts and discharges, and to do and perform all and every act and thing whatsoever requisite and necessary to be done in and about the premises, as fully to all intents and purposes as we could do if personally present at the doing thereof, with full power of substitution and revocation; hereby ratifying and confirming all that shall lawfully be done by virtue hereof."

117 N.Y.S.—38

Legally, as between the importers and the partnership, these papers were powers of attorney revocable at will; but we are not concerned with their interpretation as between the importers and the partnership. Inter sese they were, in my opinion, the "contracts" alluded to in the third clause of the agreement. The paper states that the collector has exacted and will continue to exact duties on a specified line of goods, that such assessment is without warrant of the law, and the partnership is made the true and lawful attorney and agent of the importer to recover the amount of duties so exacted contrary to law, and for its information and services it shall receive a fee of 50 per cent. of all amounts recovered. The partnership agreement provides that:

"All contracts made with merchants or importers or any other persons in the name of Frederick W. Brooks belong to said copartnership, and said parties of the first part have an undivided one-half interest in said contract as soon as the same are respectively executed."

These are the papers made with merchants or importers in the name of Frederick W. Brooks, and they have been executed. They are the only papers which could by any stretch of construction come within the description, and are the only papers executed by such merchants and importers. As goods covered by these papers came in, the partnership received the protest slips set forth in the opinion of Mr. Justice SCOTT, containing the information necessary to enable the partnership to make out the proper protests to be filed. These slips were in two forms. One was:

"In pursuance of contract with you, please file protest against the action of the collector of the port on the following importation"

—giving details. The other:

"In pursuance of contract with you, please take the necessary proceedings for the recovery of duties exacted in excess on merchandise hereinafter described."

In pursuance of what contract? Obviously the power of attorney containing the agreement for compensation. The majority of the court think that these protest slips were the contracts; that is, an individual contract was made each time such slip was sent to the partnership. But, not being signed, they cannot be said to have been "executed" as the partnership agreement provides. If contracts, what are the terms? When payable? How much? I see no escape from the conclusion that these parties, who knew all about their own business when they prepared their agreement, their powers of attorney, and their protest slips, thoroughly understood that the "contracts" were these papers, containing a power of attorney and an agreement for compensation. If I am right, it follows that these papers, the "contracts" covered by the agreement, continued until revoked, and any protests filed for the importers who executed said papers upon the goods therein referred to came within the purview of the partnership agreement. The defendant could not, without notice, go on doing business under said "contracts," an undivided one-half interest in which, as soon as executed, vested in the plaintiffs, without being accountable for such business to the plaintiffs. He therefore should be charged with one-

half the net amounts received by him upon protests filed after the dissolution of the partnership for importers with whom said "contracts" had been made and still continued unrevoked, and to whom notice of dissolution of the firm had not been given. Having been made with the partnership, they continued to belong to it.

In other respects I concur in the opinion of Mr. Justice SCOTT.

---

## LEHIGH & H. R. RY. CO. v. CENTRAL TRUST CO. OF NEW YORK.

(Supreme Court, Appellate Division, Second Department. June 11, 1909.)

RAILROADS (§ 166*)—MORTGAGES—CONSTRUCTION AND OPERATION.

Appeal from Special Term, Orange County.