ALLEN H. STEM, Individually and as Surviving Partner of the Firm of REED & STEM, Respondent, *v.* WHITNEY WARREN and CHARLES D. WETMORE, Composing the Firm of WARREN & WETMORE, Appellants, Impleaded with WILLIAM J. REED, as Executor, etc., of CHARLES A. REED, Deceased, Respondent.

First Department, January, 10, 1919.

Partnership — joint adventurers — agreement between two firms of architects to prepare plans and supervise construction of certain buildings and naming one partner as executive head — contracts with railroad company — effect of death of partner named as executive head — bad faith of other firm in procuring termination of contract — right of surviving partners to compensation for carrying on business of firm.

Joint adventurers are governed by the same requirements as to good faith in their dealings with each other and with the subject-matter of the joint adventure as apply to copartnerships.

Two firms of architects agreed to join as associates for the purpose of completing plans and supervising the construction of station buildings and such other buildings as a railroad company might desire to intrust to them, and they further agreed that they were to share and share alike as firms and not as individuals in the profits and losses of the association. Under said agreement a member of the second firm was named and mutually accepted as the executive head of the work and the railroad company given the right to make a change in such position or to fill a vacancy, and said company was also given authority to terminate the employment of the architects upon notice. After the plans and specifications had been prepared and work commenced upon the station and some other buildings, the executive head designated in the agreement died and a few days thereafter a member of the first firm without any suggestion on the part of the railroad company and without the knowledge or consent of the surviving member of the second firm or his representatives, wrote a letter to the railroad company suggesting that the old agreement with the associated architects be terminated and a new contract made with the first firm, which suggestion was acted upon by the company and the first firm thereupon proceeded to carry on its new contract and completed the station and the other buildings which had been commenced under the old agreement.

*Held,* that the agreement between the associated architects was not terminated by the death of the member of the first firm, the designated executive head, since the agreements between the parties show that the contingency of such death was taken into consideration and provision made for the selection of a new executive, thus showing that it was the intention of the parties that the agreement was to continue and be binding even if said member of the firm should die;

That the obligations of the joint adventurers to the railroad company were not canceled by the death of the executive head of the associated architects;

That the first firm should be held accountable to the surviving member of the second firm for the profits made out of the transaction of the joint enterprise in so far as it related to unfinished work which had been assigned to them prior to the death of the member of the other firm, since the cancellation of the original contract was brought about in bad faith by the members of the first firm.

Under the requirement of the utmost good faith which equity applies to the dealings between copartners which must be applied to this contract of joint adventure, if one partner brings about or induces the termination of the employment under which they are operating and thereby obtains for himself the profits and benefits that would otherwise flow to the copartnership, he should be held liable in equity to account to his copartner.

There is no fixed rule as to the rights of compensation to partners who carry on the business of a partnership after the death of one of the members. Each case must be decided on equitable principles.

As a general rule the surviving partner is not entitled to compensation for his services, it being recognized that his duty requires him to do whatsoever is within his power to further the joint enterprise for the common advantage of all.

The first firm should also be required to account to the surviving member of the second firm for the amount received for preparing the plans and specifications of a hotel constructed for the railroad company, it appearing that the preliminary plans made prior to the termination of the contract with the associate architects were of great value in preparation of the final plans, and said firm should not be allowed any deduction from such amount for their services.

But since the employment to supervise the construction of said hotel was not under the terms of the original contract but was by virtue of a subsequent agreement made not alone with the railroad company in question but also with another company, and since the railroad companies were not bound to employ the architect who prepared the plans and specifications to supervise the construction, the first firm should not be required to account for the amount received for such services.

APPEAL by the defendants, Whitney Warren and another, from an interlocutory judgment of the Supreme Court in favor of the respondents, entered in the office of the clerk of the county of New York on the 23d day of November, 1916, upon the decision of the court after a trial at the New York Special Term.

The judgment directed an accounting.

*John G. Milburn* of counsel [*Walter F. Taylor* and *Edwin De T. Bechtel* with him on the brief; *Gerald Hull Gray,* attorney], for the appellants Warren and Wetmore.

*Arthur I. Strang* of counsel [*Strang & Taylor,* attorneys], for the defendant, respondent, William J. Reed.

*Harold Swain,* for the plaintiff, respondent.

PAGE, J.:

In or about the year 1902, as a result of competition in which various architects participated, the firm of Reed & Stem were employed by the New York Central and Hudson River Railroad Company to design preliminary plans and render certain other services as architects in connection with the proposed erection of a new Grand Central Station, and in connection therewith the proposed erection of various other buildings which it was contemplated might be built over,

upon or in the vicinity of the land then used by said railroad company for railroad tracks for a space of several blocks extending in a general northerly direction from the said Grand Central Station. Acting in pursuance of said employment the firm of Reed & Stem designed and prepared various plans, sketches and preliminary drawings, whereby the scheme was formulated for the purpose of establishing the station and an accompanying group of large and important buildings. After the scheme had been formulated and the preliminary plans aforesaid prepared, it was suggested on behalf of the railroad company that the firm of Warren & Wetmore should be associated with the firm of Reed & Stem. Thereupon, an agreement under date of the 8th of February, 1904, was entered into between the firm of Warren & Wetmore and Reed & Stem, whereby they agreed to join as associates under the name of "Architects for the Grand Central Station" for the purpose of completing the plans and supervising the construction of the Grand Central Station buildings and such other buildings as the New York Central and Hudson River Railroad Company may desire to intrust to the associates, as provided for in an agreement between the New York Central and Hudson River Railroad Company and the parties hereto, dated the same day.

It was further agreed that the parties were to share and share alike as firms and not as individuals in the profits and losses of the association, except as to the payment for preliminary plans, and other work, for which provision had been made in an arbitration agreement simultaneously signed. Further, to devote their joint labor and talents to the work which might be given them by the railroad company so as adequately and properly to perform said work and to be jointly responsible to the railroad company for the proper and satisfactory carrying out of said work. It was also provided that:

" Mr. Charles A. Reed of the firm of Reed & Stem is hereby named and mutually accepted as the executive head of the work. He shall have control of the work and may hire and discharge all clerks, draftsmen and employees of the association; and each of the members of the firms, parties hereto, will, to the best of his ability carry out the directions of said

executive head. In event of a vacancy in the said position of executive head by resignation or otherwise, or upon the written request of the railroad company for a change in said executive head, the said railroad company shall have the right to determine from time to time, as it may choose, which member of the firms, parties hereto, shall be the executive head, and the parties hereto are to abide by such determination."

On the same day a contract was entered into between the New York Central and Hudson River Railroad Company and the parties to the foregoing agreement, wherein it was recited that the persons composing the firm of Reed & Stem and the persons composing the firm of Warren & Wetmore " have united and associated themselves together, and hereby unite and associate themselves together for the purpose of acting jointly as architects for the railroad company on the work hereinafter provided." The agreement provides that the architects agree to act as architects for the railroad company and to render all architectural services which may be necessary or required, subject to and in accordance with the provisions of this agreement for or in connection with any building or buildings which may be erected on the present site of the Grand Central Station and for certain other buildings therein mentioned, the railroad company to be the sole judge of the work which shall be designed and executed through the agency of the architects. The architects covenant and agree to devote their joint labor and talents to the work which may be intrusted to them from time to time by the railroad company, and covenant and agree to be jointly responsible to the railroad company for the proper and satisfactory performance of all the architectural services therein provided for.

The contract further provides that Charles A. Reed is to be executive head of the architects and as between the railroad company and all contractors of the railroad company the said Charles A. Reed and his successor or successors as such executive head shall be the agent and representative of the architects in all matters provided for in this agreement.

" In case of the death or in case of the resignation of the said Charles A. Reed, his successor or successors as such executive head, or in case the railroad company shall at any time be dissatisfied with the said Charles A. Reed, his suc-

cessor or successors as such executive head, the railroad company shall have the right to and may at any time, and from time to time, designate in writing which one of the architects shall be the executive head. Such designation in writing, delivered to any one of the architects shall be binding and conclusive upon all the parties hereto."

The contract then provides for the rate of compensation for the performance of the work under the contract and further states:

" *Sixth.* The railroad company reserves, and the architects covenant and agree that the railroad company shall, at all times, have the right to terminate the employment of the architects upon the work or any part thereof herein provided for, by giving notice in writing to the architects or their executive head of intention so to do; and the employment of the architects under the provision hereof shall be terminated and ended accordingly, upon such date as may be specified in any such notice in writing."

The architects then entered upon the performance of said agreement and had progressed to the extent that the plans and specifications were prepared and work commenced on the Grand Central Station and some twenty-four of the buildings for which the railroad company had directed the architects to prepare plans and supervise the construction.

On or about the 12th day of November, 1911, Mr. Reed died. On November 16, 1911, the following letter was written by Charles D. Wetmore of the firm of Warren & Wetmore to William H. Newman who was the executive head of the Grand Central Terminal improvement:

" DEAR Mr. NEWMAN.— I am enclosing proposed contract which is intended to follow the old form in all particulars, except that Warren & Wetmore are the architects. I would be glad to take the matter up with you in person at any time that may suit your convenience.

" At the death of Mr. Reed the old contract is terminated and a new contract becomes necessary. I would suggest that the old arrangement be terminated as of the 15th day of November and accounts be settled as of that date, and any new arrangements that may be made shall commence as of that date.

" You will note that under clause ' Sixth ' of the contract between your company and the architects, you have the right to terminate the agreement at any time."

The court has found that this letter was written without any suggestions on the part of the railroad company and without the knowledge or consent of the plaintiff or any representative of the Reed estate. On December 6, 1911, Mr. Newman stated to the board of directors of the railroad company that upon the death of Mr. Reed the company had the right under the contract of employment to either designate some one of the other architects as executive head or to terminate the employment of the architects under the contract, and he recommended that the employment be terminated and a new contract made with the firm of Warren & Wetmore to complete the work which had already been assigned under the original contract and any other which might be assigned to them upon the same terms as those specified in the original contract and at no greater cost to the company; Warren & Wetmore to hold the company harmless as against the associated architects. A resolution was thereupon passed authorizing the president to give the cancellation notice provided for in the 6th paragraph of the employment agreement terminating the employment of architects. The resolution further provided that the proper officers of the company be " authorized to make a new contract with the firm of Warren & Wetmore, under which Warren & Wetmore shall agree to complete the architectural work on the buildings heretofore assigned to the associated architects under the original agreement or which may hereafter be assigned to Warren & Wetmore under the new contract, and under the same terms as those specified in the original contract and at no greater cost to the company than if the original contract had been completed by the associated architects." Such cancellation notice was thereafter given to Warren & Wetmore and to the surviving partners of the firm of Reed & Stem and the successors of the copartnership of Reed & Stem notifying them that pursuant to the 6th article they had exercised the option, right and privilege reserved to the New York Central and Hudson River Railroad Company to terminate the employment to become and be effective at and upon the ending of the day,

being the 31st day of December, 1911, and thereupon, on the nineteenth day of December a new contract was entered into between the New York Central and Hudson River Railroad Company and the firm of Warren & Wetmore. The firm of Warren & Wetmore thereupon proceeded to carry out the said contract and they completed the Grand Central Station and the twenty-four buildings which were commenced and partly completed under the old agreement. An accounting was had of all compensation earned up to and including the 31st day of December, 1911, and the amount found due has been paid.

The plaintiff brings this action to recover from the firm of Warren & Wetmore the proportionate amount that would have been received by the firm of Reed & Stem if the original contract had been carried out in accordance with its terms, in so far as these particular buildings are concerned, and also to recover for the commissions earned upon the construction of the Biltmore Hotel.

It is very evident that by the agreement organizing the association of architects, the firms of Reed & Stem and Warren & Wetmore became joint adventurers for the purpose of the performance of the architectural services in relation to the contemplated improvement by the New York Central and Hudson River Railroad Company, as specified in the said agreement, and that there being no definite term for the performance of the said agreement its duration was to be measured and limited by the completion of the work therein specified, subject, however, to its being sooner terminated by the railroad company pursuant to the provision in the 6th article of the agreement between the railroad company and the architects.

It is well settled that joint adventurers are governed by the same requirements as to good faith in their dealings with each other and with the subject-matter of the joint adventure as apply to copartnerships. Therefore, the important questions to be determined on this appeal are:

(1) Was the agreement between the associated architects terminated by the death of Reed?

(2) By reason thereof were the obligations of the joint adventurers to the railroad company canceled?

(3) Is the firm of Warren & Wetmore to be held account-

able for the profits made out of the prosecution of the joint enterprise in so far as it related to unfinished work which had been assigned to them prior to Reed's death?

(1) Was the agreement between the associated architects terminated by the death of Reed? In my opinion, it is very clear that it was not. In the first place this agreement construed with the agreement made between the railroad company and the associated architects shows that the contingency of Reed's death was taken into consideration by the parties to the agreement at the time they executed it, and provision was made for the selection of someone to take his place in the event of his death or resignation, thus showing that it was clearly the intention of the parties that the agreement was to continue and be binding upon all the parties thereto and the terms of the agreement were to be performed even if Reed should die. (*Braddock* v. *Hinchman*, 78 N. J. Eq. 270.)

(2) By reason thereof were the obligations of the joint adventurers to the railroad company canceled? It is to be noted that in the agreement between the associated architects they bound themselves jointly and severally to be responsible to the railroad company for the proper performance of the work undertaken under the agreement with the railroad company, and as we have seen above, provision having been made for a continuance of the contract in case of Reed's death, the death of Reed would not have released his estate from the obligations of the contract. Therefore, we are brought to consider the next question:

(3) Is the firm of Warren & Wetmore to be held accountable for the profits made out of the prosecution of the joint enterprise in so far as it related to unfinished work which had been assigned to them prior to Reed's death? The railroad company had the absolute right without rhyme or reason to cancel the contract between themselves and the associated architects, and if they had done so without the suggestion or procurement of the members of the firm of Warren & Wetmore they would have had the right to enter into a new contract with Warren & Wetmore, but under the requirement of the utmost good faith that equity applies to the dealings between copartners which must be applied to this contract of joint adventure, if one copartner brings about or

First Department, January, 1919.    [Vol. 185.

induces the termination of the employment under which they are operating, and thereby obtains for himself the profits and benefits that would otherwise flow to the copartnership, he can be held liable in equity to account to his copartner. (See *King* v. *Leighton*, 100 N. Y. 386; *Masters* v. *Brooks*, 132 App. Div. 874; *Jepson* v. *Killian*, 151 Mass. 593; *Roby* v. *A. C. Ins. Co.*, 120 N. Y. 510.)

The learned justice at Special Term has found that the cancellation by the railroad company of the contract of February 8, 1904, between the railroad company and the associated architects and the execution of the new contract of December 19, 1911, between said railroad company and the firm of Warren & Wetmore were brought about by the secret actions and solicitation and procurement of the defendants Whitney Warren and Charles D. Wetmore with the purpose and intent of excluding the plaintiff and the estate of Charles A. Reed from any profits and emoluments which would accrue after December 31, 1911, in connection with the work which the associated architects had in hand and under way and uncompleted on December 31, 1911. There is ample evidence to sustain this finding of fact.

As to the Biltmore Hotel, a somewhat different question arises than is considered above in relation to the work which had been assigned and was partially completed.

The construction of a hotel upon the site upon which the Biltmore Hotel now stands seems to have been at all times in contemplation of the railroad officials. Negotiations were opened with one Baumann, who originally was to make a substantial contribution to the expense of construction. He employed a firm of architects who worked in conjunction with the associated architects, in the preparation of tentative plans, under an arrangement for division of fees. After the arrangement for financing the building of the hotel was changed whereby the entire cost was to be borne by the railroad company, this firm of architects ceased to have any connection with the associated architects. The hotel was to be built in part above the tracks of a portion of the incoming station. It, therefore, became necessary that the general plan and design of the hotel should be agreed upon before the construction of this portion of the station could be begun

or the plans therefor definitely determined. Therefore, we find insistence upon speed in the preparation of these plans, in order that the contract for the steel for the station might be prepared.

Prior to December 31, 1911, many tentative plans were prepared and although none had been definitely accepted, a substantial agreement had been reached, and the attorneys were engaged in drafting the lease of the hotel. Between the 31st day of December, 1911, and February 15, 1912, Warren & Wetmore, in consultation with the firm of architects representing Baumann, prepared the plans and specifications which were accepted by the parties in interest, and annexed to the contract, whereby the New York Central and Hudson River Railroad Company and the New York, New Haven and Hartford Railroad Company undertook to erect the hotel, for an amount approximating $5,500,000, which the Beau Site Company (a corporation organized by Baumann and in which he owned practically all the stock) agreed to lease, and on the same date this lease was signed. This contract provided that Warren & Wetmore were to be the architects, and Mr. Graham, of the firm which theretofore had represented Baumann was named as consulting architect. In the preparation of the plans annexed to the contract, Warren & Wetmore used the preliminary plans theretofore prepared by the associated architects and a comparison of the completed plans with the preliminary plans shows in the great part a similarity in fundamental particulars, so that it appears that the preliminary plans were of great value to the architects in preparation of the final plans, and the work done by the associated architects, in producing those plans, was of great and substantial value. The work progressed and was completed under the supervision of Warren & Wetmore. The learned justice at Special Term has allowed the plaintiffs one-half of all the architects' fees received by Warren & Wetmore in the entire transaction with respect to the Biltmore Hotel.

There is no fixed rule of law as to the rights of compensation to partners who carry on the business of a partnership after the death of one of the members. Each case must be decided on equitable principles, appropriate to the facts of the case.

As a general rule the surviving partner is not entitled to compensation for his services, it being recognized that his duty requires him to do whatsoever is within his power to further the joint enterprise for the common advantage of all.

But there are many exceptions to the rule, where the courts recognize that the rule as applied to the facts would produce an inequitable result. Nothing can move a court of equity but equity and good conscience. In the instant case there can be no question, in my opinion, but that the firm of Warren & Wetmore should be required to account for the amount received for preparing the plans and specifications, that being but a continuation of the business that the associated architects were engaged in at the termination of the contract on December 31, 1911, and in carrying out which Warren & Wetmore availed themselves of the preliminary plans and results of labor expended by the association. Nor should Warren & Wetmore be allowed any deduction from that amount for their services.

By the contract between the New York Central and Hudson River Railroad Company and the associated architects, the railroad company agreed to pay as compensation for services rendered percentages on the actual final cost of the completed buildings — one per cent for preliminary plans and estimates, two per cent for working plans and specifications as finally accepted by the railroad company and one per cent for supervision. As we have above stated in so far as the plaintiff and Warren & Wetmore were concerned, this contract continued to be the contract of the parties in so far as all uncompleted work was concerned, and the contract made between the railroad company and Warren & Wetmore did not supersede it, to the extent that the relation of these parties *inter sese* was concerned. Therefore, Warren & Wetmore should account to the extent of three per cent of the cost of the completed building.

The employment to supervise the construction was not under the terms of the original contract but was by virtue of the contract of February 15, 1912, made not alone with the New York Central and Hudson River Railroad Company but also with the New York, New Haven and Hartford Railroad Company.

While it may be true, as stated by the learned trial justice,

that the associated architects had a reasonable expectation of being employed to supervise the construction of the hotel, there was no assurance that they would be so employed. Supervision requires the personal attention and skill of the supervisor. The railroad companies were not bound to employ the architect who prepared the plans and specifications to supervise the construction; to my mind this should be treated as in the nature of new work undertaken, not on behalf of the former partnership, nor in which the assets of that partnership were employed.

It is further to be noted that the plaintiff did not offer to contribute of his time and skill in this work nor demand any participation therein, and, in my opinion, is not entitled to share in the compensation therefor.

The findings and judgment will be modified in accordance with this opinion and as modified affirmed, with costs to the respondents.

CLARKE, P. J., LAUGHLIN, DOWLING and MERRELL, JJ., concurred.

Judgment modified in accordance with opinion and as modified affirmed, with costs to respondents. Order to be settled on notice.