In the Matter of the Judicial Settlement of the Account of GRACE QUARTLEY BROWN and Others, as Executors of and Trustees under the Will of STEPHEN HOWLAND BROWN, Deceased.*

Surrogate's Court, New York County, July 5, 1924.

Executors and administrators — accounting — assets — sum on deposit with testator's brokerage firm was property of wife — voucher not required for payment of income to wife, who is executrix, where amount is included in schedule signed by wife — brokerage concern has good will as to general brokerage business, " odd lot " business, and " two-dollar business," but not as to firm's speculative business — executors of estate of member of firm chargeable with his proportionate share of good will of firm — base for determining good will is average yearly net profit for three years preceding death of testator which is not chargeable to investment, personal services of members, or speculative business — good will is twice said average annual net profit — value of good will fixed by transfer tax appraiser not controlling in proceedings for settlement of account of executors — fact that testator did not participate in business for several years prior to his death does not deprive estate of share of good will.

On the judicial settlement of the account of executors the evidence shows that a sum of money on deposit with a brokerage firm of which the testator was a member was in fact the property of the testator's widow, one of the executors.

A voucher for money paid to the widow from the income of the estate is not required on the judicial settlement of the account of the executors, where it appears that the schedule on the accounting sets out the payment and that the affidavit affixed to the account is signed by the widow as executrix. Furthermore, under the will in question the widow alone is entitled to the entire income and, therefore, the infant objectants have no interest therein.

A stock brokerage concern has a good will as to general brokerage business, " odd lot " business, and " two-dollar business " done by it, but does not have a good will as to the firm's speculative business.

The executors of a member of a stock brokerage concern which was engaged in general brokerage and " odd lot " business are chargeable with the testator's share of the good will of the firm.

The base for determining the good will of a stock brokerage concern is the average yearly net profit for three years preceding the death of the testator less the

---

* Affd., 211 App. Div. 662.

interest on the firm capital invested in other than speculative business, the value of personal services of the members, and profits derived from the firm's speculative business.

The value of the good will of the firm is twice the average net income as thus computed.

The value of the good will as fixed by the transfer tax appraiser does not control in this proceeding for a judicial settlement of the account of the executors although the executors have paid the transfer tax on the basis of the appraisal.

The fact that the testator was unable to and did not attend to his duties during several years preceding his death did not deprive his estate of his proportionate share of the good will.

Proceeding to settle executors' accounts.

*Lord, Day & Lord* [*Franklin B. Lord* and *Sherman Baldwin* of counsel], for executors and trustees.

*Charles Brandt, Jr.*, special guardian for objecting infant legatees.

Alfred Frankenthaler, Referee:

Stephen H. Brown died July 20, 1917. His last will and testament was admitted to probate August 13, 1917. The executors and trustees filed their accounting October 27, 1922. The special guardian representing infant remaindermen filed objections to the account. Three grounds are specified.

The first is that the accountants have failed to include as part of the estate the sum of $43,940.78 on deposit with Vernon C. Brown & Co. at the time of decedent's death. The various letters which have been placed in evidence, written to the firm by the decedent during his lifetime, establish clearly that the account in question was at the time of decedent's death the property of Grace Quartley Brown, his widow. Whether or not the same was taxed in the transfer tax proceeding as a gift made in contemplation of death is immaterial. The fund unquestionably was the property of Mrs. Brown at the decedent's death and is not part of the estate.

The third objection is that no proper voucher appears for the payment of $5,380.67 made by the executors on January 9, 1919, to Vernon C. Brown & Co. and charged to Mrs. Brown as a payment to her on account of income from the estate. The schedule of the account in which the said payment appears and the affidavit affixed to the account are signed by Mrs. Brown and she thereby acknowledges receipt of said payment on account of the income. Under the circumstances no voucher is required. Furthermore, under the will the widow alone is entitled during her lifetime to receive income from the estate and the infant objectants have no interest therein.

The disposition of the special guardian's second objection — that the executors and trustees failed to include among the assets of

the decedent the value of his interest in the good will of the firm of Vernon C. Brown & Co., of which firm decedent was a member at the time of his death — requires a more extended consideration of the facts.

It appears that the firm of Watson & Brown was organized in 1895 for the purpose of doing a stock brokerage business. It was composed of one Watson, Vernon C. Brown and Stephen H. Brown, the decedent. In 1901 Watson withdrew and the business was conducted under the name of Vernon C. Brown & Co., and was composed of Vernon C. Brown and his brother, Stephen H. Brown. The firm had offices at No. 80 Broadway, New York city. At various times between 1901 and 1911 other members were admitted to the firm and adjustments made from time to time of the respective interests of the partners in the profits. There were no articles of copartnership at the time of the death of the decedent. The only articles of copartnership which the firm had were dated January 2, 1911, and expired December 31, 1912; they were not renewed.

For some time before 1912 the decedent was the board member of Vernon C. Brown & Co., being engaged daily on the floor of the Stock Exchange. In 1912 he was taken ill, and in 1913, on account of the state of his health, was compelled to retire from his active duties as a member of the firm. He came to the office occasionally and performed only such duties as the state of his health permitted. The decedent's capital contribution of $75,000 was allowed to remain in the firm and he continued to draw a reduced portion of the profits. This reduction was gradual between January 1, 1912 — when it was thirty-three per cent — to July 20, 1917, the date of his death — when it was fifteen per cent. No salaries were paid to any of the partners.

The firm of Vernon C. Brown & Co. conducted various branches of the stock brokerage business. (1) General brokerage — buying and selling stocks and bonds for customers outright and on margin. That this item was considerable is shown by the profits realized therefrom. (2) An " odd lot " business. The unit of sale and purchase on the Stock Exchange is 100 shares. Vernon C. Brown & Co. engaged to furnish stock in smaller units either to customers or to other brokers for a consideration. (3) The firm was engaged in the " two-dollar business." It bought stock for other brokerage houses and charged a commission of two dollars for each 100 shares. The charge is now two dollars and fifty cents, but the name " two-dollar business " still persists. This was as to a part a " specialists' business "— a concentration at one post of the exchange where certain stocks were dealt in. This requires skill in the execution of orders and involves possible liability for failure

to execute orders promptly. (4) The firm had what was known as an " S " account — speculative account. This consisted of its own transactions in stocks, incidental to the business; it was simply a house account.

I am of the opinion that the general brokerage end of the firm's business carried with it a good will. The firm was a well-established, going concern and had a good reputation on Wall street as a general brokerage house. The firm's " odd lot " business likewise contains the elements of good will. This, although conducted with other brokers and not with the general public. The witness Vernon C. Brown (who is one of the executors herein and one of the surviving members of the firm) testified that an odd lot dealer deals in shares of stock the same as a dry goods merchant deals in dry goods; also that most stockbrokers do not transact an odd lot business and that this firm was well known as an odd lot house. So, too, is there a good will present in the " two-dollar business." Though the other brokers resorted to the specialist's post and he was relied upon to execute the orders at the right time, no small element in this branch of the business is the strength and reputation of the firm behind the floor member. The fact that the honesty, judgment and other individual qualities of the members of the firm are involved does not necessarily make this the type of business to which good will does not attach. These elements are also present — though not to the same degree — in the case of the ordinary mercantile business, in which there is concededly a good will. On the other hand, the individual qualifications are not so predominant as in the case of a doctor or lawyer. As for the speculative account, this was not the type of business to which good will attaches. There were no customers; the firm was only buying and selling for its own account. The absence of good will in this one branch of the business will become a material factor in measuring the value of the good will of the business as a whole.

The executors contend broadly that no good will attaches to professional occupations such as lawyers and doctors, and that in this respect the brokerage business partakes of the nature of those professions. In the able brief submitted by their counsel they rely upon certain English and New York authorities, to which I will briefly refer.

In *Wilson* v. *Williams* (29 L. R. Ir. 176) the court limited the decision to the facts immediately before it, expressly disclaiming any intention to " lay down any hard and fast rule as to stockbrokers' business being in every case incapable of good will." The case is distinguished in *Hill* v. *Fearis* (L. R. [1905] 1 Ch. 466), a case much in point, which holds that good will was an asset of a stock

brokerage firm and that the surviving member thereof must account for the decedent's interest in said good will.

The court (at p. 472) said: " It is said that there is no such thing as good will in a stockbroker's business, first, because of the nature of the connection between the stockbroker and those with whom he does business. That I do not quite follow. * * * I can quite imagine that the successor in business of the old broker might * * * get an advantage in that way by being able to represent that he was carrying on the original business. It seems to me, therefore, that that branch of the argument fails; that it is impossible to say that the advantage derived from the connection may not be some pecuniary value. * * * He may be able to represent to clients that he is the successor in the business, and get such advantage as there may be arising out of the connection without saying that he is entitled to carry on the business in the old name."

And (at p. 477): " I hold that in winding up the affairs of this partnership the good will must be treated as one of the assets of the firm, and must be realized with the other assets of the firm."

As to the New York cases cited, *Read* v. *Mackay* (47 Misc. 435) deals with the question of the firm name of a banking concern. The court does not hold that such a firm has no good will, but recognizes its existence.

In *Masters* v. *Brooks* (132 App. Div. 874) the work was of a legal nature and to all intents and purposes the defendant was practicing law. The business was carried on in the name of the defendant. The court held that the defendant by continuing to practice as a revenue attorney under his own name after the termination of the partnership could not be compelled to account for the proceeds of his business to the old firm upon the theory that he had appropriated the good will represented by the name. The reported opinion in *Matter of Halle* (103 Misc. 661) merely holds that the appraiser had taken no proof concerning the elements of the good will of the stock brokerage firm of " Halle & Stieglitz," and, therefore, was not justified in finding that there was no good will. The court remitted the proceeding to the appraiser " for the purpose of appraising the value of the decedent's interest in the good will of the business." The court recognized that such a concern had a good will. In the subsequent proceedings, not disclosed in the reported cases, the firm was found to have a good will and the value of the decedent's interest therein was determined. As to *Matter of Dickey* (N. Y. L. J. June 1, 1922) there is nothing in the facts and nothing in the decision which warrants the conclusion urged by the executors herein that the case holds that

because the partnership there considered was a brokerage firm no good will attached to it. In that case it was not the nature of the business, but the nature of the partnership interest of the decedent as determined by the articles of copartnership which the learned surrogate found to be controlling.

I hold that the firm of Vernon C. Brown & Co. had a good will at the time of the death of the decedent and that his estate is entitled to fifteen per cent of the value thereof, that being the extent of his interest in the partnership. The transfer tax appraiser has fixed the value of the decedent's interest in the good will at $38,682.12 and the decree fixing the transfer tax was entered upon the appraiser's report. However, said determination is not controlling in this proceeding (*Matter of Crawford*, 85 Misc. 283; *Amherst College* v. *Ritch*, 151 N. Y. 282), nor is the fact that the executors have since paid said tax. The appraiser fixed the value of the good will at three times the average annual net earnings not attributable to the investment of the firm funds nor to the personal services of the members. I shall adopt the same general method, but shall deduct from the total profits the amount of profits which arose out of speculative transactions (to which I have held above the element of good will does not attach), and shall apportion to the various departments of the business the expenses, interest and salaries. Furthermore, the business in this case being quasi-professional and personal, I find that the three years' purchase of the net annual profits (calculated on an average of three years) usually employed in measuring the value of the good will of commercial concerns should not be applied here. The nature and character of the business of Vernon C. Brown & Co. is such that two years' purchase is just and equitable.

Applying these principles to the data before me we have the following computations: The aggregate gross profits of the speculative account for the years 1914, 1915 and 1916 immediately preceding decedent's death are $372,552.85, which is thirty-nine and fifty-seven one-hundredths per cent of $941,442.32, the aggregate gross profits of the entire business for those years. Accordingly the average annual net profits for said period, exclusive of the speculative account, were $160,719.80. From this should be deducted the annual interest at six per cent on sixty and forty-three one-hundredths per cent (the portion not applicable to the speculative business) of the $350,000 capital invested, or $12,690.30. In thus fixing the invested capital I have not included the value of the Exchange seats held by some of the members of the firm, for the reason that the witness for the executors (whose figures as to the value of members' services I have adopted) testified that he

had taken into consideration the value of the use of the seats in fixing the value of the services of the members of the firm. In fact the cash capital investment was also included by the witness, but under all the circumstances for the purpose of this computation I have allowed interest thereon at six per cent per annum. The thirty to forty per cent testified to by the executors' witness as the return upon investment received by Stock Exchange firms is high, and as it was expressly stated to include also the partners' personal services, that percentage cannot be allowed here, because I am allowing deduction for the services of the firm members. Executors' witness fixed the value for the members' services at an average of $159,000 per annum. While this appears liberal it was not shown to be unreasonably high. However, the estimated salaries covered the activities of the members engaged in all the branches of the business, including the speculative, and accordingly the total should be reduced by a proportionate amount which can be said to be the portion of the salaries attributable to the speculative branch of the business. I shall apportion the salaries to the speculative branch in proportion to the profits realized therein and accordingly find that the deductible item for salaries is $96,083.70. Deducting said sums of $12,690.30 and $96,083.70 from the sum of $160,719.80 above we have $51,945.80. Taking two years' purchase as the value of the good will we have $103,891.60. Decedent's interest in the firm's good will is fifteen per cent of this, or $15,583.74.

These computations are: Gross profits all departments, three years, $941,442.33; gross profits " S " account, three years, $372,-552.85. " S " account, therefore, represents thirty-nine and fifty-seven one-hundredths per cent of the total; other departments represent sixty and forty-three one-hundredths per cent of the total.

Net profits in all departments, three years, $797,880.86; one-third of which is average annual net profits all departments, or $265,960.28; sixty and forty-three one-hundredths per cent of which is average annual net profits from departments other than " S " account, or $160,719.80. From this deduct: Average annual interest, $21,000; less interest apportioned to " S " account (thirty-nine and fifty-seven one-hundredths per cent), $8,309.70 — $12,690.30. Average members' salaries, $159,000; less apportioned to " S " account, $62,916.30 — $96,083.70; total $108,774, leaving $51,945.80; two years' purchase, $103,891.60; decedent's interest is fifteen per cent, or $15,583.74.

The contention that because decedent was unable to attend to his duties during the years preceding his decease he was not entitled to his share of the good will is not well founded. If it is

meant to argue that he was not a member of the partnership, it is against the proof. If he was a partner he was entitled to his share of the good will as much as to any other partnership asset. The other partners may have been generous in permitting the decedent to remain in the firm, but their altruistic motives cannot be considered in determining the value of his interest. I cannot write for the parties a less gracious partnership arrangement than they chose to make for themselves.

Decedent's interest in the good will of the firm of Vernon C. Brown & Co., valued herein at $15,583.74, should have been included by the executors as an asset of the decedent's estate.

Submit findings in accordance herewith.

O'BRIEN, S.:

The referee's report is confirmed and the exceptions thereto overruled. The evidence adduced concerning the character and scope of the business of Vernon C. Brown & Co. shows that the business included elements of good will. Under the facts proven the rule adopted by the referee in determining the value of the good will was properly applied and the computation was just and equitable. (*Matter of Halle*, 103 Misc. 661.)